825 So.2d 1098 (2002)
NEW ORLEANS CAMPAIGN FOR A LIVING WAGE, Jean Matthews and Philomenia Johnson
v.
CITY OF NEW ORLEANS, Marc Morial, Mayor, The Council of the City of New Orleans and the State of Louisiana.
The Small Business Coalition to Save Jobs, The Louisiana Restaurant Association and the Business Council of New Orleans and the River Region,
v.
The City of New Orleans.
No. 2002-CA-0991.
Supreme Court of Louisiana.
September 4, 2002.
*1100 Stefanie J. Allweiss, Edward F. Harold, New Orleans, Horace A. Thompson, III, for Applicant.
Richard P. Ieyoub, Attorney General, Angie R. LaPlace, Baton Rouge, William P. Quigley, New Orleans, Elaine R. Jones, Louis L. Robein, Jr., Metairie, Robert Stroup, Mavis S. Early, Evelyn F. Pugh, Charles M. Delbaum, Mark A. Moreau, Rowena T. Jones, New Orleans, for Respondent.
H. Mark Adams, New Orleans, Clyde H. Jacob, III, Joshua A. Ulman, Robin S. Conrad, Stephen A. Bokat, Tilden R. Reid, III, for Amicus Curiae United States Chamber of Commerce.
H. Mark Adams, New Orleans, Clyde H. Jacob, III, Tilden R. Reid, II, for Amicus Curiae New Orleans Regional Chamber of Commerce, The Chamber of Greater Baton Rouge, Natchitoches Area Chamber of Commerce, Thibodaux Chamber of Commerce.
Gerald J. Huffman, Jr., David M. Whitaker, New Orleans, for Amicus Curiae Sydran Food Services, II.
Margaret Diamond, Eliska M. Plunkett, New Orleans, Ernst F. Preis, Jr., for Amicus Curiae Greater New Orleans Hotel Motel Association.
Audrey N. Browne, Horace A. Thompson, III, Harry A. Rosenberg, Christopher K. Ralston, New Orleans, for Amicus Curiae Louisiana Association of Business.
David H. Williams, New Orleans, for Amicus Curiae Interdenominational Ministerial Alliance.
KIMBALL, Justice.
These consolidated cases are before the court on direct appeal from a judgment of the district court declaring unconstitutional La. R.S. 23:642, which prohibits a local governmental subdivision from establishing a minimum wage which a private employer would be required to pay employees. At the same time, the district court upheld the validity of Ordinance No. 20376, an amendment to the home rule charter of the City of New Orleans that establishes a minimum wage for individuals employed and performing work in the City of New Orleans. For the reasons that follow, we find La. R.S. 23:642 is a legitimate exercise of the police power and therefore constitutional. We also find that Ordinance No. 20376 abridges the police power of the state and is unconstitutional. Consequently, we reverse the judgment of the district court.

Facts and Procedural History
Effective August 15, 1997, Act 317 of 1997 prohibits local governmental subdivisions from establishing a minimum wage rate which a private employer would be required to pay employees. In passing this Act, which became La. R.S. 23:642, the legislature found that in order for Louisiana businesses to remain competitive and to attract and retain the highest caliber of employees, and thereby to remain sound, a business must work in an environment of uniform minimum wage rates. The legislature further found that local variation in mandated minimum wages would lead to economic instability and decline and to a decrease in the standard of living for Louisiana's citizens.
*1101 In September 2001, the New Orleans City Council passed Ordinance No. 20376, an ordinance placing on the ballot for vote by the electorate of New Orleans a proposal to add a new Chapter 5 to Article IX of the home rule charter of the City of New Orleans (the "City"). The proposed Charter Amendment (the "minimum wage law") establishes a minimum wage to be paid to employees performing work in the City of New Orleans of $6.15 per hour, or $1.00 above the prevailing federal minimum wage, whichever is greater. The ordinance does not apply to employees who are currently exempted from coverage under certain enumerated provisions of the Fair Labor Standards Act of 1938, 29 U.S.C. 201 et seq., to city or state civil service employees whose wages are regulated by a civil service commission, or to persons employed on any public works contracts governed by the Louisiana Public Bid Law. Employers who fail to comply with the minimum wage law commit a misdemeanor "punishable by a fine of up to $200 for each day and each employee that wages are paid in violation thereof."
On Saturday, February 2, 2002, New Orleans voters approved the proposed Charter Amendment. The following day, Sunday, February 3, 2002, the New Orleans Campaign for a Living Wage,[1] joined by two individuals, Jean Matthews and Philomenia Johnson (collectively the "Proponents"), instituted a declaratory judgment proceeding against the City, its mayor and City Council, and the State of Louisiana, seeking a declaration of the validity of the City's new minimum wage law. In addition, petitioners sought a declaration that La. R.S. 23:642, the state law that prohibits local governmental subdivisions from establishing a minimum wage, is unconstitutional as applied to the City of New Orleans, a pre 1974 home rule charter city.
This suit was subsequently consolidated with a suit filed the following day by the Small Business Coalition to Save Jobs,[2] the Louisiana Restaurant Association, and the Business Council of New Orleans and the River Region (collectively the "Opponents"), against the City of New Orleans, seeking a declaratory judgment that the City's minimum wage law is invalid in light of La. Const. art. VI, § 9 and La. R.S. 23:642. The suit additionally sought injunctive relief prohibiting the City from enforcing the new law.
Following trial on the merits, the district court rendered judgment declaring *1102 La. R.S. 23:642 unconstitutional, upholding the validity of the City's minimum wage law, and denying the request for injunctive relief. In written reasons, the district court found that the City's minimum wage law does not violate Article VI § 9(A) of the Louisiana Constitution, which prohibits municipalities from enacting ordinances governing private or civil relationships, because it "is not consistent with or in conflict with any Louisiana statutory provisions pertaining to substantive rights, enforcement schemes, or remedies affecting civil or private relationships, particularly tort, contract and workers' compensation laws that govern employment relationships." As to La. Const. art. VI, § 9(B), which provides that the police power of the state shall never be abridged, and La. R.S. 23:642, which prohibits local governmental subdivisions from enacting minimum wage laws, the district court ruled that the Opponents of the minimum wage law failed to prove La. R.S. 23:642 was enacted pursuant to the police powers of the state because it was not necessary to protect the vital interest of the state as a whole. According to the district court, La. R.S. 23:642 is "too severe an interference with the City of New Orleans' constitutionally enumerated powers to be justified by the state's interest in remedying perceived and speculative economic concerns," and does not constitute a reasonable exercise of the state's police power under La. Const. Art. VI, § 9(B) "so as to qualify as an exception to the prohibition against state interference with home rule discretion." For these reasons, the district court declared La. R.S. 23:642 unconstitutional.
Finally, the court considered whether the City's home rule charter, by its own terms, prohibits the enactment of a minimum wage law. Drawing upon the provisions of Section 2-101 of the charter, which gives the City "the right, power, privilege, and authority to adopt and enforce local police, sanitary and similar regulations and to do and perform all of the acts pertaining to its local affairs, property and government, which are necessary or proper in the legitimate exercise of its corporate powers and municipal functions," the district court concluded that the minimum wage ordinance is a valid exercise of the City's police power.
Following the rendition of the district court's judgment, the Small Business Coalition to Save Jobs, the Louisiana Restaurant Association, and the Business Council requested a suspensive appeal directly to this court pursuant to La. Const. art. V, § 5(D).[3] The district court granted these parties a devolutive appeal on March 28, 2002. On April 12, 2002, this court stayed execution of the district court's judgment pending further orders of this court. New Orleans Campaign for a Living Wage v. City of New Orleans, 02-0995 (La.4/12/02), 814 So.2d 1273.

Law and Discussion
As explained above, the instant case is before this court on direct appeal because La. R.S. 23:642 was declared unconstitutional by the district court. We must therefore begin with an analysis of this statute. Although the district court declared La. R.S. 23:642 wholly unconstitutional on its face, the Proponents argue only that the statute is unconstitutional as applied to the City, a pre 1974 home rule government. Specifically, the Proponents contend that the Opponents have not borne their burden of proving adequate constitutional grounds for the State to deny the City the power to adopt this *1103 particular minimum wage ordinance. In response, the Opponents argue that the statute's regulation of minimum wages is a valid exercise of the state's police power as it was enacted for the purpose of protecting the general economic welfare of the state as a whole and, therefore, an inconsistent ordinance cannot stand.
Local governmental autonomy or home rule exists only to the extent that the state constitution endows a local governmental entity with two interactive powers: the power to initiate local legislation and the power of immunity from control by the state legislature. City of New Orleans v. Board of Comm'rs of Orleans Levee Dist., 93-0690, p. 4 (La.7/5/94), 640 So.2d 237, 242. The City is governed by a home rule charter that was enacted prior to the 1974 constitution. This preexisting home rule charter was continued, and essentially constitutionalized, by La. Const. art. VI, § 4. Mortal v. Smith & Wesson Corp., 00-1132, p. 16 (La.4/3/01), 785 So.2d 1, 14; City of New Orleans v. Board of Comm'rs of Orleans Levee Dist., 93-0690 at p. 8, 640 So.2d at 244.
Article VI, § 4 of the 1974 Louisiana Constitution grants the City both the power of initiation and the power of immunity. City of New Orleans v. Board of Comm'rss of Orleans Levee Dist., 93-0690 at p. 7-8, 640 So.2d at 243. That provision states:
Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted. If its charter permits, each of them also shall have the right to powers and functions granted to other local governmental subdivisions.
A preexisting home rule charter's grant of the power of initiation is limited by Article VI, § 4 only by its provision that the local government may not exercise that power inconsistently with the constitution. City of New Orleans v. Board of Comm'rss of Orleans Levee Dist., 93-0690 at p. 9, 640 So.2d at 244. Thus, although "home rule" does not entail complete autonomy, Miller v. Oubre, 96-2022, p. 9 (La.10/15/96), 682 So.2d 231, 236, "in affairs of local concern, a home rule charter government possesses `powers which within its jurisdiction are as broad as that of the state, except when limited by the constitution, laws permitted by the constitution, or its own home rule charter.'" Smith & Wesson Corp. 00-1132 at p. 16, 785 So.2d at 14 (quoting Francis v. Morial, 455 So.2d 1168, 1171 (La.1984)).
Article VI also serves to foster local self-government by allowing home rule entities to utilize their powers and functions on the local level without revocation, change, or affect by law unless it is necessary to prevent an abridgement of the reasonable exercise of the state's police power. Smith & Wesson Corp., 00-1132 at 16, 785 So.2d at 14. Thus, Article VI protects home rule governments from unwarranted interference by the state in their internal affairs. Id. at p. 17, 785 So.2d at 14 (citing Francis, 455 So.2d at 1171).
Article VI, however, also contains a provision in Section 9(B) that ensures the powers granted to home rule governments will not be used to deprive the state government of its inherent powers. Smith & Wesson Corp., 00-1132 at p. 17, 785 So.2d at 14 (citing Francis, 455 So.2d at 1172). *1104 This section, entitled "Limitations of Local Government Subdivisions," provides:
Notwithstanding any provision of this Article, the police power of the state shall never be abridged.
This provision was adopted "as a principle of harmonizing the replete home rule powers granted local governments with a basic residuum of the state's power to initiate legislation and regulation necessary to protect and promote the vital interests of its people as a whole." City of New Orleans v. Board of Comm'rss of Orleans Levee Dist., 93-0690 at p. 19-20, 640 So.2d at 249.
The police power of the state is best defined on a case-by-case basis; however, it has been generally described as the state's "inherent power to govern persons and things, within constitutional limits, for promotion of general health, safety, welfare, and morals." Smith & Wesson Corp., 00-1132 at p. 17, 785 So.2d at p. 15 (quoting City of New Orleans v. Board of Dirs. of Louisiana State Museum, 98-1170, p. 11 (La.3/2/99), 739 So.2d 748, 757). See also Polk v. Edwards, 626 So.2d 1128, 1142; Francis, 455 So.2d at 1172. The police power extends only to measures that are reasonable. Smith & Wesson Corp., 00-1132 at p. 17-18, 785 So.2d at 15; Board of Dirs. of Louisiana State Museum, 98-1170 at p. 11, 739 So.2d at 757; Francis, 455 So.2d at 1172. A reasonable measure taken under the state's police power is one in which the action taken is, under all the circumstances, reasonably necessary and designed to accomplish a purpose properly falling within the scope of the police power. Smith & Wesson Corp., 00-1132 at p. 18, 785 So.2d at 15; Board of Dirs. of Louisiana State Museum, 98-1170 at p. 11, 739 So.2d at 757. To sustain an action under the state's police power, a court must be able to determine that its operation tends in some degree to prevent an offense or evil or otherwise to preserve public health, safety, welfare or morals. Smith & Wesson Corp., 00-1132 at p. 18, 785 So.2d at 15; Board of Dirs. of Louisiana State Museum, 98-1170 at p. 11, 739 So.2d at 757. Further, the state's exercise of its police power must not interfere with constitutional rights to an extent that is entirely out of proportion to any benefit redounding to the public. Smith & Wesson Corp., 00-1132 at p. 18, 785 So.2d at 15; City of Baton Rouge v. Williams, 95-0308, p. 6 (La.10/16/95), 661 So.2d 445, 449.
In the instant case, La. R.S. 23:642 itself purports to be an action taken under the state's police power. The statute provides:
A.(1) The Legislature of Louisiana finds that economic stability and growth are among the most important factors affecting the general welfare of the people of this state and are, therefore, among its own most important responsibilities. Economic stability and growth contribute to the standard of living enjoyed by citizens as employment and income are both dependent on the ability and willingness of businesses to operate in the state.
(2) The legislature further finds that wages comprise the most significant expense of operating a business. It also recognizes that neither potential employees nor business patrons are likely to restrict themselves to employment opportunities or goods and services providers in any particular parish or municipality. Consequently, local variation in legally required minimum wage rates would threaten many businesses with a loss of employees to areas which require a higher minimum wage rate and many other businesses with the loss of patrons to areas which allow for a lower wage rate. The net effect of this situation *1105 would be detrimental to the business environment of the state and to the citizens, businesses, and governments of the various local jurisdictions as well as the local labor market.
(3) The legislature concludes from these findings that, in order for a business to remain competitive and yet to attract and retain the highest possible caliber of employees, and thereby to remain sound, an enterprise must work in a uniform environment with respect to minimum wage rates. The net impact of local variation in mandated wages would be economic instability and decline and a decrease in the standard of living for the citizens of the state. Consequently, decisions regarding minimum wage policy must be made by the state so that consistency in the wage market is preserved.
B. Therefore, pursuant to the police powers ultimately reserved to the state by Article VI, Section 9 of the Constitution of Louisiana, no local governmental subdivision shall establish a minimum wage rate which a private employer would be required to pay employees.
If we determine that this statute was passed pursuant to a reasonable exercise of the police power of the state, and that the local minimum wage law conflicts with this statute, then the minimum wage law must fall. The City argues that although the state has the power to regulate the minimum wage in localities whose home rule charter post-dates the 1974 constitution, the state, through the application of La. R.S. 23:642, has no power to preempt the minimum wage law of localities like the City whose charter pre-dates the 1974 constitution. The constitution, however, does not differentiate between pre-1974 and post-1974 home rule charters on the issue of abridgement of the state's police power. Article VI, § 9(B) speaks to all local governments when it states that the police power of the state shall never be abridged. Thus, if the standards discussed in the foregoing paragraphs for a reasonable exercise of the state's police power are met, any inconsistent local law cannot be enforced.
Section (A) of La. R.S. 23:642 indicates that the prohibition against local governmental subdivisions establishing minimum wage rates for private employers was passed to promote economic stability and growth for all the citizens of the state. The legislature found that the net effect of local variation in minimum wage rates would be detrimental to the business environment of the state and to its citizens, businesses, local governments, and the local labor market. Consequently, the legislature found that statewide regulation of minimum wage rates is required to preserve the general welfare of the citizens of Louisiana.
These findings are supported by the legislative history of the statute. Dr. Tim Ryan, an economist and Dean of the College of Business Administration at the University of New Orleans, testified before the house committee considering the bill that became La. R.S. 23:642 that the latest wage survey conducted in 1990-1991 showed that unemployment increased after an increase in the federal minimum wage. Dr. Ryan further explained that an increase in a local minimum wage creates a competitive situation between localities and leads to businesses locating in areas with lower minimum wages. Minutes of the House Committee on Labor and Industrial Relations, April 25, 1997, p. 15. Additionally, several individuals appeared before the committee, some in favor of the bill and others in opposition to it. Those in favor of the measure opined that higher minimum wage requirements would be detrimental to their businesses and to *1106 small business owners and would lead to layoffs. Persons appearing in opposition to the bill stated the economic data presented to the committee was "garbage" and people were moving out of New Orleans because they could not make enough money. Minutes of the House Committee on Labor and Industrial Relations, April 25, 1997, pp. 15-18. After hearing this testimony, the House Committee on Labor and Industrial Relations voted in favor of the bill that became La. R.S. 23:642 and the bill was ultimately passed by both the House and the Senate and signed by the governor on June 18, 1997.
In enacting La. R.S. 23:642, the legislature determined the policy of the State of Louisiana with respect to minimum wage requirements. It prescribed that minimum wage policy decisions should be made by the state to preserve consistency in the wage market. It is the role of the legislature to make such policy decisions for our state. In making this policy determination, the legislative history reveals that the legislature relied on the expert opinion of a local economist and the opinions of citizens and local businesses. These are precisely the types of opinions the legislature should consider in setting statewide policy and, based on the opinions presented, we find the legislature's policy choice is a reasonable one.
At the trial before the district court, the Proponents presented the testimony of two expert economists who voiced disagreement with the findings of the legislature regarding the need for statewide consistency in regulation of minimum wage rates in La. R.S. 23:642 and with the expert testimony presented by Dr. Ryan. We recognize these expert opinions, but conclude they represent a disagreement among experts regarding the necessity of statewide regulation of minimum wage policy. Both sides of the issue appear to be backed by legitimate concerns and it is the legislature's function to fashion policy from these competing viewpoints. The legislature chose to require statewide regulation of minimum wage laws to maintain consistency in the wage market, and we find this policy choice to be reasonable in light of the evidence presented. The reasons for judgment assigned by the district judge indicate that the judge found the testimony of Dr. Ryan to be biased and the testimony of the Proponents' experts more compelling. In reaching this conclusion, the district court overstepped its role. The legislature has "broad scope to experiment with economic problems," and "courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93. See also Reynolds v. Louisiana Bd. of Alcoholic Beverage Control, 248 La. 639, 181 So.2d 377 (1965) (finding a valid exercise of the state's police power and stating the court had no right to review the "policy of wisdom of legislation"). By choosing to give the evidence presented by one side more weight than that presented by the other, the district court improperly second-guessed the reasoned policy choice of the legislature. Instead, the court should have evaluated whether the legislature's policy choice was reasonable in light of the evidence presented.
While the legislature is the branch of government responsible for the enactment of laws designed to foster the policy of the state, the judicial branch must ensure that the legislature's actions comport with the dictates of the constitution as adopted by the people of this state. Thus, even when legislative statements indicate an action was taken pursuant to the police power, this mere assertion does not make it so. Rather, the judicial branch *1107 must apply the analysis set forth above to determine whether an action is a reasonable exercise of the state's police power. Clearly, the legislature's determination regarding the exercise of police power must be given great weight and the judicial branch should not substitute its opinion for the choice made by the legislature. Rather, the judicial branch should analyze the legislature's choice to determine whether there is support for the legislative determination that a measure constitutes a reasonable exercise of the police power.
Additionally, the district court was apparently persuaded by the "empirical data" presented by the Proponents' expert, Dr. Pollin, who testified regarding a study he conducted in 1999 based on the economic impact of the proposed minimum wage ordinance.[4] Based on this study, Dr. Pollin testified that a one dollar increase in the minimum wage in New Orleans would not significantly affect the average firm's overall operating cost. Dr. Pollin opined the business economy of the state would not be negatively impacted by a one dollar increase in the City's minimum wage. In light of this "empirical data," which the district court found was uncontroverted, the trial judge declared La. R.S. 23:642 unconstitutional. While it is clear from the procedural posture of this case why the district court focused on the provisions of the ordinance at issue, we nevertheless find the district court fell into analytical error by concentrating on the minimum wage ordinance and basing its decision on the projected effect of a one dollar increase in the City's minimum wage. The issue to be decided is whether the state can prohibit all local governments from regulating minimum wage rates pursuant to a reasonable exercise of the police power. The fact that a one dollar increase in one municipality's minimum wage rate may or may not have an impact on the state's economy as a whole is irrelevant. The relevant inquiry is whether the legislature was reasonable in concluding that it would be detrimental to the state's interest if several municipalities increased their minimum wages and, if so, whether the statute they enacted to further this interest is reasonably necessary and designed to accomplish this purpose.
Turning to the relevant issue, we note this court has previously found that "the power to set or prescribe a minimum wage is regarded as an exercise of the police power because a minimum wage is generally intended to insure employment at fair and reasonable wages and to stimulate the economy." Louisiana Associated Gen. Contractors v. Calcasieu Parish Sch. Bd., 586 So.2d 1354, 1366 (La.1991). In this case, we find, as the statute sets forth, that state regulation of minimum wage rates is of vital interest to the citizens of Louisiana, and that statewide regulation of minimum wage rates tends to preserve the public welfare. The legislature determined as a matter of policy that minimum wage policy decisions should be made by the state to preserve consistency in the wage market. We find La. R.S. 23:642 is reasonably necessary in light of this policy determination by the legislature and is designed to promote economic stability and growth of the state, and thereby to promote the welfare of Louisianans. Moreover, we find the provisions of La. R.S. 23:642 are necessary to protect the vital interest of the state as a whole and do not constitute such an interference with *1108 the City's constitutional rights that the statute must be held unenforceable against the City. Consequently, we conclude that La. R.S. 23:642 constitutes a reasonable exercise of the state's police power, is constitutional, and is applicable to the City.
Because we find La. R.S. 23:642, prohibiting local governmental subdivisions from establishing a minimum wage rate which a private employer would be required to pay employees, is a legitimate exercise of the state's police power, we conclude the City's minimum wage law, which sets a minimum wage rate private employers are required to pay their employees, abridges the police power of the state. Therefore, we find the minimum wage law invalid.
Due to this court's conclusion that the City's minimum wage law cannot be enforced as it abridges the police power of the state and therefore violates La. Const. art. VI, § 9(B), we need not address whether the minimum wage law is also invalid under § 9(A) of art. VI. It would only be necessary for this court to address this provision, which states that no local governmental subdivision shall, except as provided by law, enact an ordinance governing private or civil relationships, had we found that La. R.S. 23:642 was inapplicable to the City or had the legislature not enacted La. R.S. 23:642. We therefore pretermit discussion of the district court's ruling regarding La. Const. art. VI, § 9(A).

Decree
For the reasons expressed above, the judgment of the district court declaring La. R.S. 23:642 unconstitutional is reversed. The district court's judgment declaring valid Ordinance No. 203.76, the Increased Minimum Wage Charter Amendment, is reversed. The district court's judgment denying and dismissing with prejudice appellants' request for injunctive relief is reversed. The City's minimum wage law, Chapter 5 of Article IX of the home rule charter, is hereby declared unconstitutional and appellants' request for permanent injunctive relief is granted.
REVERSED.
CALOGERO, C.J., concurs in the decree but dissents from the majority's reasons, and assigns reasons.
JOHNSON, J., dissents and assigns reasons.
WEIMER, J., concurs in the result and assigns reasons.
CALOGERO, Chief Justice, concurs in the decree but dissents from the majority's reasons; and assigns reasons.
I agree with the majority that Ordinance No. 20376, which establishes a minimum wage that a private employer would be required to pay its employees working in the City of New Orleans, violates the Louisiana Constitution; however, I cannot join in the majority's reasons, with which I disagree. I believe this case is resolved by an examination of the ordinance's effects on private and civil relationships under La. Const. art. VI, § 9(A), rather than its effects relative to the state's police power under La. Const. art. VI, § 9(B). Plainly, the contract of labor between an employer and employee is a private and civil relationship. The city's wage ordinance governs this private and civil relationship inasmuch as wages are an essential element of that contract. See Civ.Code art. 2670. Although purporting to define a misdemeanor, the city ordinance's mandating certain wages belies its civil objectives, *1109 similar to rent controls.[1] Thus, I share Justice Weimer's view, as stated in his concurrence, that the wage ordinance is an unlawful attempt by the city to govern private or civil relationships, an area expressly reserved to the State by Article VI, § 9(A) of the 1974 Louisiana Constitution.
On the other hand, I disagree with the majority's holding that La.Rev.Stat. 23:642, prohibiting a local government from establishing a minimum wage, was an exercise of the state's police power necessary to protect the vital interest of the state as a whole on the justification that statewide regulation of minimum wage laws would protect the general welfare of the citizens of Louisiana by preserving consistency in the wage market. Although the majority criticizes as overstepping its role the district court's independent assessment of the record evidence as to whether the legislature's decision to act was a reasonable exercise of its police power, our prior decisions make clear that the judicial branch has the constitutional duty to determine whether an act of the legislature pursuant to its police powers is of true "statewide" concern. See, e.g., City of New Orleans v. Board of Com'rs of Orleans Levee District, 93-0690 (La.7/5/94), 640 So.2d 237. Significantly, home rule charter governments existing prior to 1974 may initiate local legislation under their own police powers, and the exercise of these powers does not abridge the state's police power unless it prevents the state from initiating legislation necessary to promote or protect the health, safety, welfare or morality of the state as a whole.[2] It was the intent of the constitutional delegates to reserve to the state the power to legislate in areas of true "statewide" concern, as Justice Dennis exhaustively details in Orleans Levee District, supra.
To that end, this court in the Orleans Levee District case stated the parameters to consider when the judiciary is called upon to resolve an alleged conflict between legislation initiated by the state and that initiated by a home rule charter city, both of which are constitutional entities:
[A] litigant claiming that a home rule municipality's local law abridges the police power of the state must show that the local law conflicts with an act of the state legislature that is necessary to protect the vital interest of the state as a whole. To establish that the conflict actually exists, the litigant must show that the state statute and the ordinance are incompatible and cannot be *1110 effectuated in harmony. Further, to demonstrate that the state statute is "necessary" it must be shown that the protection of such state interest cannot be achieved through alternate means significantly less detrimental to home rule powers and rights.
93-0690 at p. 27, 640 So.2d at 252. Furthermore, "[h]ome rule abilities and immunities are to be broadly construed, and any claimed exception to them must be given careful scrutiny by the courts." Id. (citing Francis v. Morial, 455 So.2d 1168, 1173 (La.1984)).
In the instant case, I believe the opponents in this matter have not sufficiently proven that Ordinance No. 20376 abridges the state's police power in violation of La. Const. art. VI, § 9(B). It is not axiomatic that, simply because the state enacts general legislation in an area under its police powers, a local governmental subdivision is automatically precluded from acting in that same area. To say otherwise would be to hold pre-1974 home rule charter cities hostage to the whim and caprice of the legislature, a consequence that was surely not the intention of the drafters of our 1974 Constitution. See Orleans Levee District, supra. Similarly, the judiciary in deciding whether a local government's legislation abridges the state's police power must do more than merely rely on the legislature's pronouncement that a matter is of true "statewide" concern, found here in the preamble to La. Rev.Stat. 23:642. To accept such a statement at face value would effectively place pre-1974 home rule charter cities on the same constitutional footing as post-1974 cities, insofar as the legislature's ability to override local legislation by simply passing an inconsistent "general" law. Furthermore, such a position effectively overrules a long line of cases beginning with Francis v. Morial and culminating in Orleans Levee District and City of Baton Rouge v. Williams, 95-0308 (La.10/16/95), 661 So.2d 445 (the exercise of the state's police power must not interfere with constitutional rights to an extent that is entirely out of proportion to any benefit redounding to the public).
Instead, a record must be developed from which to judge the reasonableness of the legislature's decision to pre-empt an area that might otherwise be adequately handled on the local government level. Such a record was developed in this case, including evidence presented by both the opponents and proponents. Applying the "careful scrutiny" required of us by our prior jurisprudence, I do not view the evidence produced by the opponents as showing that Rev. Stat. 23:642, which prohibits a local government from establishing a minimum wage, is reasonably necessary to protect the vital interest of the state as a whole.
I am not convinced that having a uniform minimum wage throughout the state is necessary to prevent an evil from befalling the people of the State of Louisiana. In fact, the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., the act that establishes the federal minimum wage, expressly contemplates that state and local legislation might require rates above the federal level. 29 U.S.C. § 218(a) states that "no provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minium wage established under this chapter." That federal statute thus specifically contemplates that there will be a lack of uniformity among jurisdictions, and it is an inferential finding by Congress that a uniform minimum wage is not necessary to prevent an evil from befalling the people of United States, much less the people of Louisiana.
*1111 I expressed similar concerns about this court's reasoning in Morial v. Smith & Wesson Corp., XXXX-XXXX (La.4/3/01), 785 So.2d 1, a case in which this court determined that the state had a vital interest in the regulation of the firearms industry. I dissented in Morial because I did not see where the state, in reserving for itself the exclusive right to recover against the firearms industry for damages for injury, death, or loss, was attempting to prevent an offense or evil or was attempting to preserve public health, safety, welfare, or morals.
In sum, the majority's decision to find the living wage ordinance invalid under La. Const. art. VI, § 9(B) is both unsupported by the record evidence and, to my mind, fraught with peril for pre-1974 home rule charter cities.
WEIMER, J., concurring in the result.
While I agree with the majority's conclusion that Ordinance No. 20376, the Increased Minimum Wage Charter Amendment, is unconstitutional, I write separately to express my view that there exists a more appropriate avenue for resolving the constitutional conflict that presents itself in this case than the majority's resort to the provisions of Article VI, § 9(B). In my view, it is not necessary to reach the issue of whether the state's police power trumps that of the City of New Orleans, a pre 1974 home rule charter entity, because the Constitution, in Article VI, § 9(A), denies to any local governmental subdivision the power to enact legislation governing private or civil relationships unless the legislature by general law confers upon the local governmental unit the express authority to act. Because Ordinance No. 20376, which establishes a minimum wage that a private employer would be required to pay its employees working in the City of New Orleans, is an ordinance that governs a private and civil relationship, and because the State, through the enactment of LSA R.S. 23:642, has expressly denied to the City the authority to legislate with respect to the minimum wage paid by private employers, Ordinance No. 20376 cannot withstand constitutional scrutiny and must be stricken as an unlawful attempt by the City to legislate in an arena expressly reserved to the State by the 1974 Constitution.
This case arises from the attempt of a local governmental subdivision to increase the minimum wage within its jurisdiction despite a state statute prohibiting such action. Whether it is wise or prudent to raise the minimum wage is not an issue for this court to decide. It is not the role of this court to make such a policy determination, especially given the compelling social and economic objectives advanced on both sides of this debate over which reasonable and rational individuals could differ in their ultimate conclusions. The policy determination must be resolved by those entrusted with the weighty responsibility of serving in other areas of government. The role of this court is more limited. In a case in which two sovereigns the City of New Orleans and the State of Louisianahave enacted diametrically different regulations regarding the same subject matter, it is the role of this court to determine which has exceeded the boundaries of its constitutional authority. This constitutional conflict must be resolved by evaluating the provisions of the 1974 Louisiana Constitution.
An analysis of the constitutional issues presented in this case begins, in my view, with the proposition, firmly established in the jurisprudence, that local governmental autonomy or home rule exists only to the extent that the state constitution endows a local governmental entity with two interactive *1112 powers: the power to initiate local legislation and the power of immunity from control by the state legislature. See, City of New Orleans v. Board of Com'rs of Orleans Levee Dist., 93-0690, p. 4 (La.7/5/94), 640 So.2d 237, 242. The City of New Orleans derives its authority to initiate local legislation from a home rule charter enacted prior to the 1974 Louisiana Constitution.[1] That charter was continued, and essentially constitutionalized, Morial v. Smith & Wesson Corp., XXXX-XXXX, p. 16 (La.4/3/01), 785 So.2d 1, 14, City of New Orleans v. Board of Com'rs of Orleans Levee Dist., 93-0690 at 8, 640 So.2d at 243-244, by La. Const. Art. VI, § 4 (1974), which provides:
Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, function, and duties in effect when this constitution is adopted. If its charter permits, each of them also shall have the right to powers and functions granted to other local governmental subdivisions.
This Article limits a preexisting home rule charter's grant of the power of initiation only by providing that the local government may not exercise that power inconsistently with the 1974 Constitution. City of New Orleans v. Board of Com'rs of Orleans Levee Dist., 93-0690 at 9, 640 So.2d at 244. Thus, although "home rule" does not translate into complete autonomy, Miller v. Oubre, 96-2022, pp. 9-10 (La.10/15/96), 682 So.2d 231, 236, in affairs of local concern, a home rule charter government possesses under the constitution powers which within its jurisdiction are as broad as those of the state, except when limited by the constitution, laws permitted by the constitution, or its own home rule charter. Morial, XXXX-XXXX at 16, 785 So.2d at 14 (quoting Francis v. Morial, 455 So.2d 1168, 1171 (La.1984)).
The City of New Orleans' home rule charter stakes a continuing claim to the utmost powers of initiation available to the City under the constitution. City of New Orleans v. Board of Com'rs of Orleans Levee Dist., 93-0690 at 10, 640 So.2d at 245. In particular, Section 2-101 of the charter claims for the City "the right, power, privilege and authority to adopt and enforce local police, sanitary and similar regulations, and to do and perform all of the acts pertaining to its local affairs, property and government, which are necessary or proper in the legitimate exercise of its corporate powers and municipal functions." See, Home Rule Charter of the City of New Orleans, Art. II, § 2-101(4) (1954). Additionally, Section 2-101 asserts for the City all powers that could be claimed under the laws of the state at the time of the adoption of the charter, any subsequent enlargements of those powers, any power granted to a similar corporation, and all powers "that may be necessary or useful to enjoy a home rule charter." Id. Section 2-101(1) and 2-101(2). In sum, the City of New Orleans' home rule charter asserts, and Article VI, § 4 of the constitution authorizes the City to exercise, any legislative power within its boundaries that is not inconsistent with the 1974 constitution. City of New Orleans v. Board of Com'rs of Orleans Levee Dist., 93-0690 at 11, 640 So.2d at 245.
*1113 The power to enact minimum wage legislation is an exercise of the police power, La. Assoc. General Contr. v. Calcasieu School Board, 586 So.2d 1354, 1366 (La. 1991); Parish Council of Parish of East Baton Rouge v. Louisiana Highway & Heavy Branch of Associated General Contractors, Inc., 131 So.2d 272, 281 (La.App. 1 Cir.1961), that on its face falls within the City of New Orleans' home rule power to initiate legislation. However, while the powers of initiation conveyed by Article VI, § 4 of the constitution are broad enough, standing alone, to confer authority on the City of New Orleans to enact minimum wage legislation, Section 9 of that same constitutional provision simultaneously withholds part of the authority conveyed by Section 4. While this section of the constitution does not purport to strip a local governmental subdivision entirely of its police power, it does set forth specific limitations in certain areas. Hildebrand v. City of New Orleans, 549 So.2d 1218, 1225 (La.1989). Pursuant to Article VI, § 9:
(A) Limitations. No local governmental subdivision shall (1) define and provide for the punishment of a felony; or (2) except as provided by law, enact an ordinance governing private or civil relationships.
The question that presents itself for this court's resolution is whether Ordinance No. 20376, the City's minimum wage law, runs afoul of Section 9(A)(2)'s prohibition against enactment of an ordinance "governing private or civil relationships."[2]
The exact parameters of this prohibition are not precise, and the imprecision that surrounds those parameters is not substantially clarified by examination of the historical background of the provision. Article VI, § 9 finds its source in the National Municipal League's Model State Constitution.[3] The source provision states that the grant of home rule initiative "shall not include the power to enact private or civil law governing civil relationships...."[4] The provision is intended as a legislative recognition of the fact that laws governing relationships between private entities are more properly the subject of statewide legislation which would produce a desired uniformity in treatment of such interests than municipal legislation which could result in an endless variety of private law.
As one of the leading commentators on this subject has explained:
The prevailing assumption has been that home rule powers do not extend to the enactment of private law. Deviations from that understanding should be permitted only in the event of clear necessity. The complexities created by 51 different law-making jurisdictions in what has become a single economic and social community are manageable; if each of the thousands of cities and villages entitled to exercise home rule powers were thereby empowered to adjust contract, property, and the host of other legal relationships between private individuals, chaos would ensue.
Sandalow, The Limits of Municipal Power under Home Rule, 48 Minn.L.Rev. 643, 678-679 (1964); See also, Comment, Municipal Home Rule Power: Impact on Private Legal Relationships, 56 Iowa *1114 L.Rev. 631 (1970-1971) ("It is generally accepted that home rule grants do not include the power to enact `purely' private law. The social and economic considerations of uniformity, certainty, and predictability in private legal relationships support this principle. For example, the effect of a different law of contracts or torts in each city would obviously be chaotic.").
That this was also the intent behind the enactment of Louisiana's constitutional prohibition against ordinances governing private or civil relationships is evidenced by the drafting history of the local government article as reflected in the transcripts of the constitutional convention debates. While floor discussion regarding the meaning of the phrase "private or civil relationships" was scant, Delegate Walter I. Lanier, Jr.[5] did indicate that the prohibition is "a standard type of provision." See, VII Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, September 26, 1973, Statements of Delegate Lanier at 1442 (1977) (hereinafter cited as Records). By way of explanation, he specifically referred the convention delegates to Professor Sandalow's law review article on the subject (quoted above), Id. at 1445, making it clear that it was the intent of the drafters to preserve the traditional understanding, expressed in that article, that local government is not empowered to make law in the private arena due to the overriding need for consistency, predictability and uniformity in the regulation of such relationships.
Despite the obvious intent behind the prohibition, its parameters remain deliberately imprecise according to convention transcripts. Apart from Delegate Lanier's cursory explanation of the term,[6] the debates are silent as to the precise meaning of the phrase. As Delegate Thomas Casey complained: "After discussing this with the committee I'm really not convinced with [sic] a true definition of `civil relationship' might be, and how encompassing these words affect many things that might be handed down to local government." Records, Sept. 26, Statements of Delegate Casey at 1444. "I'm not sure what the true, thorough, and real definition of civil relationships might be. That's really what worries me." Id. Delegate Gordon Kean summed up the purposeful inexactitude surrounding the provision in a law review article published subsequent to the adoption of the constitution:
The authority of local government under the home rule provisions of the new Constitution is not without limits. Section 9 prohibits any local governmental subdivision from defining or providing for the punishment of a felony or from enacting ordinances "governing private or civil relationships." This latter prohibition is in keeping with the tradition that local government is not empowered to make private law. The question may well arise, however, as to what constitutes "private law" within the meaning of the prohibition. Certainly, no local government should have its own body of contract, property or tort law; and the Section 9 prohibition was included to make it absolutely clear that such could *1115 not be the case. However, any local governmental exercise of the police power could have an impact upon private relationships in one way or another. A clear delineation of this prohibition against private law will, therefore, have to await judicial interpretation.
Kean, Local Government and Home Rule, 21 Loy.L.Rev. 63, 71-72 (1975).
The jurisprudence has had occasion to address the prohibition in Article VI, § 9 in only two instances. In Javers v. Council of City of New Orleans, 351 So.2d 247 (La.App. 4 Cir.1977), the Court of Appeal was asked to determine if the City of New Orleans was compelled to submit to the electorate a proposed charter amendment which would have established a landlord relations commission with power generally to control rents within the City. In holding that the city council had discretion to refuse to submit the proposal to a referendum because the proposal was clearly unconstitutional, the Court of Appeal noted various aspects of the proposal that were constitutionally repugnant: the proposal would confer on a tenant-landlord relations commission the power to control rents within the City; it would impose numerous requirements on the contents of a lease; it would require registration of any rental facility with the City; and, it would prevent the commencement of eviction proceedings in court without first obtaining a certificate of eviction from the commission. These provisions, the Court of Appeal recognized, "would fly in the face of the laws of the State of Louisiana as found in the Civil Code, Revised Statutes, and Code of Civil Procedure pertaining to freedom of contract, property rights in general and relations between landlord and tenant in particular. Key provisions of the proposal interfere drastically with the right of citizens to use the courts as set forth in the Civil Code and the Code of Civil Procedure." Javers v. Council of City of New Orleans, 351 So.2d at 249. While the Court of Appeal held that the City was constitutionally precluded from enacting such legislation by virtue of the prohibition against enacting legislation inconsistent with any general law contained in Article XIV, § 22 of the Constitution of 1921 (a limitation on the initiation powers of pre 1974 home rule charter governments this court subsequently held was not carried forward in the 1974 constitution, see City of New Orleans v. Board of Com'rs of Orleans Levee Dist., 93-0690 at 17, 640 So.2d at 247-248), it opined, without discussion or elaboration, that the proposal would also violate Article VI, § 9's prohibition against enacting ordinances governing private or civil relationships.
The only other case to address the Section 9 prohibition is Hildebrand v. City of New Orleans, 549 So.2d 1218 (La.1989). In Hildebrand, this court ruled on the constitutionality of a series of ordinances levying a municipal inheritance tax in the City of New Orleans. The district court had declared the ordinances unconstitutional, ruling that, among other things, the ordinances violated Article VI, § 9's prohibition against enacting an ordinance governing private or civil relationships. This court reversed. In so doing, the court interpreted Section 9(A) as reserving to the State the exclusive right to deal with felons in the criminal field and with private or civil relationships in the civil field. The court noted:
The Legislature has enacted codes and statutes governing private and civil relationships in such areas as persons, property, obligations, successions, donations, matrimonial regimes, delictual responsibility, prescription, sales, leases, partnerships, corporations, mortgages, trusts, insurance, banking and many other areas. These laws include regulation of the transmission and receipt of *1116 property upon the death of the owner. The ordinances at issue do not attempt to govern any of the relationships established by the Legislature.
Hildebrand, 549 So.2d at 1223-1224. Hildebrand was the finding that while the value of an inheritance was affected by the ordinances, the right to regulate the private and civil relationships between the owner of property and his heirs or legatees was not.
Massachusetts has a constitutional prohibition similar to Louisiana's. It provides in pertinent part: "Nothing in this article shall be deemed to grant to any city or town the power to ... (5) enact private or civil law governing civil relationships except as an incident to an exercise of an independent municipal power...."[7]
In Marshal House, Inc. v. Rent Review and Grievance Board of Brookline, 357 Mass. 709, 260 N.E.2d 200 (1970), the Supreme Court of Massachusetts was called upon to interpret the meaning of this prohibition in a dispute challenging the validity of a municipal by-law attempting to establish a rent review and grievance board for the purpose of controlling rents in the city of Brookline. In holding that the by-law violated the constitutional prohibition against enacting private or civil law, the Massachusetts court, although declining to precisely define the term "civil relationships," did conclude:
The term `private or civil law governing civil relationships' is broad enough to include law controlling ordinary and usual relationships between landlords and tenants. The language is not so confined as clearly to apply only to general legislation like the Uniform Commercial Code, or the laws governing marriage or intestate succession to property. (Citations omitted.)
Marshal House, Inc., 260 N.E.2d at 205.
The Massachusetts court expanded upon its delineation of illustrative "civil relationships" in a subsequent decision upholding the validity of an ordinance challenged under this same constitutional provision. In Bloom v. City of Worcester, 363 Mass. 136, 293 N.E.2d 268 (1973) a city ordinance establishing a human rights commission with subpoena powers was upheld on the finding that "[t]he law governing civil relationships between persons, such as between landlords and present or prospective tenants and between employers and present or prospective employees, is wholly unaffected by the ordinance. No new rights or obligations between persons are created by the ordinance; no existing rights or obligations between persons are modified or abolished." Bloom v. City of Worcester, 293 N.E.2d at 275 (italics and emphasis supplied).[8]
While the decisions of the Massachusetts courts are not binding on this court, they are nevertheless instructive in determining the meaning of Article VI, § 9's prohibition against ordinances governing "private or civil relationships."[9] Like the Massachusetts *1117 court, I believe that while the exact parameters of what constitutes a "private or civil relationship" must await a case by case delineation, the phrase is broad enough to include law controlling ordinary and usual relationships between employers and employees.[10]
This conclusion is buttressed by examination of the plain meaning of the words that comprise the constitutional phrase. BLACK'S LAW DICTIONARY (6th ed.1990) defines the term "private" as "affecting or belonging to private individuals, as distinct from the public generally." It defines "civil" as "relating to private rights and remedies sought by civil actions as contrasted with criminal proceedings." Under these very basic definitions, the employment relationship is both a private relationship and a civil relationship. It is a private relationship because the parties to the relationship, particularly those the City's minimum wage ordinance seeks to affect, are private individuals.[11] It is a civil relationship because it is a relationship established by the civil law: the employment agreement is a species of lease governed by Title IX of the Civil Code. See LSA C.C.art. 2699 ("Lease or hire is a synallagmatic contract to which consent alone is sufficient, and by which one party gives to the other the enjoyment of a thing, or his labor, at a fixed price."); Voitier v. Church Point Wholesale Bev. Co., Inc., 99-1777, p. 5 (La.App. 3 Cir. 4/5/00), 760 So.2d 451, 456, writ denied, XXXX-XXXX (La.9/29/00), 770 So.2d 350.
While the relationship between an employer and his or her employees is thus a private and civil relationship within the meaning of Section 9(A)(2), virtually all public regulation infringes upon private relationships to some extent. In acknowledgment of this fact, the constitutional prohibition of Section 9(A)(2) extends only to those ordinances that seek to "govern," or regulate, such relationships. This was the import of the court's holding in Hildebrand, 549 So.2d at 1224, wherein it was determined that although the relationship between the owner of property and his heirs or legatees was a civil or private relationship, the ordinance at issue in that case did not seek to regulate that relationship. A different situation exists in this case.
The principal incentive for entering an employment relationship is the exchange of toil and time for compensation. The wages, benefits, and conditions negotiated and established between an employer and his or her employees are the essence of the employment relationship. Here, through passage of the minimum wage ordinance, the City seeks to regulate directly *1118 an essential term of this purely private relationshipits price[12]and thereby to control the principal incentive for entering into the relationship at all. The City's ordinance impermissibly seeks to "govern" the private employment relationship because it modifies existing rights and obligations between the parties to the relationship, directly and unavoidably affecting the ability of the parties to negotiate price.
The fact that the avowed purpose of the ordinance is public"to make it reasonably possible for [employees who work in the City of New Orleans] to earn a sufficient income to afford the basis necessities of food and shelter"-and that its violation is punishable as a crime, does not relieve the ordinance of its constitutional infirmity. The civil, private, public and criminal aspects of the ordinance may "overlap" to some extent. See, Marshal House, Inc., 260 N.E.2d at 206. Nevertheless, the methods of carrying out the public objective contained in the ordinance are predominantly civil in character and directly govern a private and civil relationship. Just as the City could not regulate the civil relationship of marriage by criminalizing divorce, it cannot regulate the private employment relationship by criminalizing the failure of a private employer to pay a specified minimum wage.
The district court in resolving this case concluded that the City's minimum wage ordinance does not violate the prohibition in Article VI, § 9(A) because it is not "in conflict with any Louisiana statutory provisions pertaining to substantive rights, enforcement schemes, or remedies affecting civil or private relationships, particularly tort, contract and workers' compensations laws that govern employment relationships." This is too limited a reading of the constitutional prohibition. Under Article VI, § 9(A), the proper inquiry is not whether a municipal ordinance creates private law in conflict with existing regulations, but whether it affects a private or civil relationship. Here, the employment relationship is a private and civil relationship. The City's minimum wage ordinance seeks to regulate an important and ordinary aspect of this private and civil relationship. Although the ordinance at issue in this case is simpler than that struck down in Javers v. Council of City of New Orleans, 351 So.2d 247, the two ordinances are not constitutionally distinguishable. Just as the City's attempt to institute rent control was considered to constitute an impermissible regulation of the private landlord-tenant relationship in Javers, the minimum wage ordinance at issue here constitutes an impermissible attempt by the City of New Orleans to govern an important and ordinary aspect of the private employment relationship.
That being said, it must be noted that Article VI, § 9(A)(2) was not intended to be, and is not, a blanket prohibition against the enactment of private law by a local governmental subdivision. Rather, a review of the transcripts of the constitutional convention debates on the local government article reveals that the delegates understood that virtually all public regulation infringes upon private relationships to some extent, making it necessary to incorporate some flexibility into the constitution.[13]
*1119 The National Municipal League's Model State Constitution attempts to resolve the problem caused by the inevitable infringement of public lawmaking on private relationships by permitting an exception to the prohibition against enactment of private laws. The model provision states that the grant of home rule initiative shall not include the power to enact private or civil law governing civil relationships "except as an incident to an exercise of an independent municipal power."[14] Under this exception, an ordinance will not be invalid merely because it affects private relationships, if it does so as an incident to the exercise of another independent municipal power.[15]
The delegates to Louisiana's constitutional convention considered the approach of the National Municipal League, but ultimately failed to incorporate its suggested language into Louisiana's constitution. See, Records, Sept. 26, Statements of Delegate Lanier at 1444-1445. Instead, the convention delegates adopted the language "Except as provided by law" to provide balance and flexibility to what would otherwise stand as a blanket prohibition against local government regulation of civil or private relationships. Delegate Lanier, a proponent of the measure, explained that the added language would allow the legislature to determine if a situation demanded deviation from the general rule prohibiting local governments from enacting private law "and by specifics or special law provide for the activity by local governments in a specified area." See, Records, Sept. 26, Statements of Delegate Lanier at 1445. He described the provision as "sort of a Dillon's Rule[16] under a prohibition that we have put against local governments. In other words as an exception to this prohibition in specific cases as authorized by the legislature, the local units of government can act in this area." Id.
A reading of the foregoing passages within the context of the drafting history as a whole, leads to the conclusion that it was the aim of the constitutional convention by Section 9(A)(2) to withdraw from local governmental subdivisions the power to initiate legislation governing civil or private relationships. The State has reserved to itself in the constitution the exclusive power to enact legislation regulating relationships among private individuals. However, to afford the State flexibility in this arena, the constitution provides that the legislature may, by general law, delegate its authority to act to local government. Unless it does so, however, and expressly *1120 surrenders its primacy, local governmental subdivisions have no power to act.
The City's minimum wage ordinance, which purports to regulate an important aspect of the private and civil employment relationship, is an unconstitutional encroachment upon matters expressly reserved to the State in the 1974 Constitution. Unless, pursuant to the constitution, the legislature delegates to the City the authority to enact legislation in this private arena, the ordinance is unconstitutional. With the passage of LSA-R.S. 23:642, the legislature has not only failed to delegate authority to enact minimum wage legislation to the City of New Orleans, it has expressly denied such authority. As a result, Ordinance No. 20376 cannot withstand constitutional scrutiny and must be stricken as an unlawful attempt by the City of New Orleans to legislate in an arena expressly reserved to the State by the 1974 Louisiana Constitution.
Because I am of the opinion that the foregoing represents the proper analysis to employ in this case, I simply concur with the majority's result, finding it unnecessary to reach the difficult issue of whether the State's police power trumps that of a pre 1974 home rule charter entity on the basis of a legislative choice between competing expert testimony on a matter over which substantial and compelling debate exists.

CONCLUSION
At the risk of being repetitive, but for the sake of emphasis, I conclude as I began, by stating what issue this case addresses and what issues this case does not address. The issue before this court is not whether those who toil for minimum wage are entitled to additional compensation; the issue before this court is not whether the economy will be adversely impacted if the minimum wage is raised in one area of the state. This case does not involve thwarting the will of the voters; this case does not involve voting oneself a raise. Those who engage in such rhetoric make arguments which are not germane to the resolution of the issue before this court.
This case does highlight a serious societal issue. However, whether raising the minimum wage is an appropriate solution is subject to substantial debate even among those learned in the field who have studied the issue for a lifetime. This difficult policy issue is not one to be answered by the courts in the quiet solitude of judicial chambers. This difficult policy decision must be made following reasoned public discussion before those governmental entities established to resolve such policy issues.
Ultimately, the only issue which this court must address is which sovereign the City of New Orleans or the State of Louisianahas the constitutional authority to make the difficult policy determination regarding the minimum wage. In our system of government, it is the constitutionally established role of this court to ultimately determine what we as citizens expressed in our constitution and apply that determination to a particular case.
No one should revel in the outcome of this litigation. Instead, the time, talent, and effort exerted in this matter can be perhaps productively channeled into a public discussion on how to address the difficult societal and economic issues presented by this litigation.
JOHNSON, J., dissenting.
If Louisiana is the poorest state in the nation, then New Orleans is certainly one of the poorest cities in America with a disproportionate number of workers relegated to low paying service jobs.
*1121 In September, 2001, the New Orleans City Council passed Ordinance No. 20376. The ordinance placed on the ballot, for vote in the city of New Orleans/Parish of Orleans, a proposal to add a new Chapter 5 to Article IX of city's Home Rule Charter ("the Charter"),[1] establishing a minimum wage law. If the measure passed, the new minimum wage would be established at $6.15 per hour, or $1.00 above the prevailing federal minimum wage, whichever is greater.[2] On Saturday, February 2, 2002, New Orleans voters overwhelmingly approved the proposed Charter amendment.
The following day, the New Orleans Campaign for a Living Wage[3] ("proponents") sued the city of New Orleans, the mayor, city council, and State of Louisiana, seeking a declaratory judgment professing the minimum wage law's validity. Proponents also sought a declaration that LSA R.S. 23:642[4] is unconstitutional as applied to New Orleans because it conflicts with the Charter, which was adopted prior to the state's 1974 Constitution. The proponents' case was consolidated with a suit filed by the Small Business Coalition to Save Jobs, the Louisiana Restaurant Association, and the Business Council of New Orleans & the River Region ("opponents"). The opponents sought judgment declaring the minimum wage law invalid, in light of LA. CONST. ART. VI, § 9 and LSA R.S. 23:642.
*1122 After trial on the merits, the Civil District Court for the Parish of Orleans found LSA R.S. 23:642 unconstitutional, declared the minimum wage law valid, and denied the opponents' request for injunctive relief. The district court rejected the opponents' claim that increasing the minimum wage in New Orleans violated LA. CONST. ART. VI, § 9(A)(2) and concluded LSA R.S. 23:642 was not a reasonable exercise of the State's police power under LA. CONST. ART. VI, § 9(B).
The majority concludes that the Louisiana Constitution does not differentiate between the pre-1974 and post-1974 Home Rule Charters on the issue of abridgement of the State's police power. This holding is inconsistent with well-settled jurisprudence. This Court has previously held:
[T]he 1974 [Louisiana] [C]onstitution creates two classes of home rule governments with different levels of immunity from control by the State Legislature: (1) preexisting home rule municipalities may exercise within their boundaries any legislative powers not in conflict with the 1974 state constitution; and (2) all other local governments may exercise home rule powers consistent with the constitution except when the exercise of such power is denied by general law.
City of Baton Rouge v. Williams, 95-0308 (La.10/16/95), 661 So.2d 445, 448 (citing City of New Orleans v. Board of Comm'rs of Orleans Levee District., 93-0690 (La.7/5/94), 640 So.2d 237) (emphasis added).
The New Orleans Home Rule Charter obviously predates Louisiana's 1974 Constitution, as it was established in 1912 and was recognized in Louisiana's 1921 Constitution. Moreover, the Charter predates the 1997 enactment of LSA-R.S. 23:642. In Williams, 661 So.2d at 447-48, this Court stated:
[The New Orleans City Charter] was enacted under the authority of Article XIV, § 3(a), of the Louisiana Constitution of 1921. The Constitution of 1974, Article VI, § 4 provides for the continuance of existing home rule charters, as follows:
Every home rule charter or plan of government existing or adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this Constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted.
See also Hildebrand v. City of New Orleans, 549 So.2d 1218,1221 (La.1989).
In explaining the 1974 constitution's effect on municipalities with home rule charters that predated the constitution's adoption, this Court held:

Section 4 of Article VI cannot be construed without absurdity to permit the legislature to supersede the ordinances of the [City of New Orleans ("CNO")] simply by enacting an inconsistent general state law; for this would reduce the immunity of the CNO to a level below that of the nonantecedent home rule governments whose valid ordinances are protected by Sections 5 and 7 of Article VI from reversal by the legislature except by general state laws that deny, rather than merely conflict with, their local laws. To interpret the Constitution as conferring on the CNO an immunity no greater [or weaker] than that attributed to the local governments which acquire home rule authority after the adoption of the 1974 Constitution would conflict with the clear intent of the drafters and ratifiers to grant all preexisting home rule *1123 governments a greater degree of autonomy.

City of New Orleans v. Board of Comm'rs of Orleans Levee District, 93-0690 (La.7/5/94), 640 So.2d 237, 248 (emphasis added).
Furthermore, this Court noted:
[T]he constitution in article VI ... fosters local self-government by granting to home rule bodies the discretion to deploy their powers and functions on the local level, which may not be revoked, changed, or affected by law unless necessary to prevent an abridgment of the reasonable exercise of the state's police power.... Section 6 was added to the local government article to protect home rule charter governments from unwarrantable interference in their internal affairs by state government.
Francis v. Morial, 455 So.2d 1168, 1171 (La.1984). This Court has also held that "a home rule charter government possesses, in affairs of local concern, powers which within its jurisdiction are as broad as that of the state, except when limited by the constitution, laws permitted by the constitution, or its own home rule charter." Id. (emphasis added).
In examining the Louisiana Constitution, it is "self-evident that Article VI ... strikes a different balance of power between the state legislature and home rule governments.... Home rule entities must be regarded as more than creatures of the legislature, since their powers and functions are granted directly by the constitution and their discretion of deployment is constitutionally preserved against undue interference." Id. (citing R. Gordon Kean, Jr., Local Government and Home Rule, 21 LOY. L.REV. 63, 66 (1975)) (emphasis added).
In a long line of jurisprudence, we have recognized the right of home rule entities to regulate their affairs with minimum interference from state government, limited only by the police power of the state, which shall never be abridged. "Police power" can only be defined on a case by case basis. In Francis, supra, this Court defined police power as "the inherent power of the State to govern persons and things, within constitutional limits, for the promotion of the general security, health, morals, and welfare." Id. at 1172. In that case, this Court recognized that the State's police power does not justify interference with constitutional rights which is entirely out of proportion to any public benefit. Id. at 1173. It follows then, that the State legislature does not have unqualified power to withdraw, preempt, or overrule a local law.
Board of Com'rs. Of New Orleans Levee Dist., supra, established the burden of proof required in a challenge to a local ordinance. This court stated:
[A] litigant claiming that a home rule municipality's local law abridges the police power of the state must show that the local law conflicts with an act of the state legislature that is necessary to protect the vital interest of the state as a whole. To establish that the conflict actually exists, the litigant must show that the state statute and the ordinance are incompatible and cannot be effectuated in harmony. Further, to demonstrate that the state statute is "necessary" it must be shown that the protection of such state interest cannot be achieved through alternate means significantly less detrimental to home rule powers and rights.
Id., 640 So.2d at 252.
When it enacted LSA R.S. 23:642, the legislature declared economic welfare a vital state interest and concluded that economic stability required a consistent minimum wage state-wide. The questions we *1124 must resolve are these: Does LSA-R.S. 23:642 protect a vital or compelling state interest? If so, can that state interest be achieved through less drastic alternatives?
Dr. Timothy Ryan[5] testified as an expert for the State. In Dr. Ryan's opinion, minimum wage legislation is counter-productive by making Louisiana less attractive to businesses. Dr. Ryan conducted no studies of the impact a minimum wage increase would have in Orleans Parish. It is significant to note that Dr. Ryan expressed opposition to the federal minimum wage, as well as minimum wage legislation in any form. He testified that every increase in the federal minimum wage has resulted in increased unemployment. Dr. Ryan concluded that the impact of the local variation and mandated higher minimum wage would result in economic instability and decline, as well as a decrease in the standard of living.
Dr. Robert Pollin[6] testified on behalf of plaintiffs. In contrast to Dr. Ryan's testimony before the legislature, Dr. Pollin testified that there is no statistical correlation over time between changes in the national minimum wage and employment in the United States.
In 1999, Dr. Pollin conducted a study of the business industry in New Orleans.[7] The study revealed that, for the average firm, the cost due to the $1.00 increase in the minimum wage would result in an additional 0.9% increase in overall operating costs. The cost of labor includes everyone, including managers and supervisors, and minimum wage laborers are not a significant percentage of costs. Small firms with one to nine employees would see a 0.5% impact. Firms with one to twenty-four employees would have 0.6% impact. According to the study, the two industries that would face the largest average cost increases are the restaurant industry (2.2% cost increase) and the hotel industry (1.7% cost increase).[8] Dr. Pollin concluded that this small increase in the firms' operating budget would not induce restaurants or hotels to incur the costs of relocating. Therefore, plaintiffs were able to show that the $1.00 increase in the minimum wage would have a negligible effect on the economy.
Additionally, plaintiffs' expert, Dr. Thomas Weiss Kopf,[9] was of the opinion that the city-wide minimum wage would lead to an increase, rather than a decrease, in the standard of living of citizens. He opined that far from causing economic instability and decline, a city-wide minimum wage would lead to greater stability in the New Orleans labor market, and a stronger business base in the city and state.
There is no empirical evidence to support the State's conclusion that a variation in the minimum wage would be detrimental to the State's interests. In fact, there is overwhelming evidence to the contrary. In my mind, the State has failed to show *1125 that LSA-R.S. 23:642 is "necessary" to protect the vital interest of the state as a whole. The City's effort to insure that a working family has the ability to live above the poverty line, without relying on government subsidies (food stamps, etc.), is a legitimate exercise of its authority under the Home Rule Charter.
For the aforementioned reasons, I dissent.
NOTES
[1] According to the petition, the New Orleans Campaign for a Living Wage is "an association of organizations and citizens residing in the City of New Orleans, who have worked for years to try to raise wages for the working poor in New Orleans." The coalition is composed of the Association of Community Organizations for Reform Now ("ACORN"), Local 100, Service Employees International Union, the Hospitality, Hotels, and Restaurants Organization Council ("HOTROC"), the Greater New Orleans AFL CIO, various other community, religious, and civic organizations, and New Orleans employees who work for less than $1 per hour over the federal minimum wage.
[2] According to its petition, the Small Business Coalition to Save Jobs is an association of various organizations, including the Louisiana Restaurant Association, the Business Council of New Orleans and the River Region, the New Orleans Regional Chamber of Commerce, the Greater New Orleans Hotel and Motel Association, the Louisiana Association of Alcoholic Beverage Licensees, the Louisiana Association of Business and Industry, and the National Federation of Independent Businesses, Louisiana Chapter. The coalition was formed "to promote the economic opportunities of the City of New Orleans, member businesses, to support programs that allow the members to grow the number of jobs they provide and to prevent actions that would be detrimental to the economy of New Orleans and to the development of jobs in New Orleans."
[3] La. Const. art. V, § 5(D) provides that a case shall be appealable to this court if "a law or ordinance has been declared unconstitutional."
[4] We note this data was not presented to the legislature for its consideration in connection with Act 317 of 1997, which became La. R.S. 23:642, and, in fact, was not collected until after the effective date of the Act. In light of our findings herein, however, we need not address this issue.
[1] Notably, the contract of labor is defined in our Civil Code as a form of lease. See Civ. Code art. 2669. Thus, the rent ordinance struck down in Javers v. Council of City of New Orleans, 351 So.2d 247 (La.App. 4 Cir. 1977), and the wage ordinance in this case are similar in that both were crafted to govern the proceeds from a form of lease contract.
[2] In Orleans Levee District, we explained:

[T]he constitutional grant of the home rule power to initiate legislation and the power of immunity from control of the legislature to a local government does not necessarily cause the state as a whole to sustain an abridgment of its police power. The total police power of the state is not diminished every time the legislature is constitutionally denied the right to substitute its legislative initiative for that of the home rule governments. A net loss in the exercise of the police power of the state would occur only when a local government's conflicting law or ordinance would prevent the state from initiating action through its legislative branch necessary to promote or protect the health, safety, welfare, or morality of the state as a whole. In other words, division and delegation of the police power within the state itself does not automatically cause its abridgment.
93-0690 at p. 22, 640 So.2d at 250.
[1] The City of New Orleans is governed by a Home Rule Charter originally enacted by Acts 1912, No. 159, and constitutionally recognized by La. Const. Art. XIV, § 22 (1921).
[2] Because violation of the City's minimum wage law is punishable as a misdemeanor, the limitation on a local governmental subdivision's power of initiation set forth in § 9(A)(1) is not implicated in this case.
[3] See, XII Records of the Louisiana Constitutional Convention of 1973: Committee Documents, p. 58.
[4] National Municipal League, Model State Constitution, § 8.02 (6th ed.1963).
[5] Delegate Lanier served as a member of the Convention's Committee on Local and Parochial Government. He went on to serve as a city judge in Thibodaux, a district judge in Lafourche Parish, and as a judge on the First Circuit Court of Appeal. Both sides to this litigation have quoted his remarks in their briefs.
[6] Delegate Lanier explained that it was his appreciation that the provision "is intended to preempt from local government the power to pass on such things as might be contained in the civil code, the Workman's Compensation law, the trust code, the corporation law and things of this type." Records, September 26 at 1442.
[7] M.G.L.A. Const. Amend. Art. 2, § 7(5) as amended by Amend. Art. 89.
[8] Bloom's expansion of the definition of "civil relationships" to include the employer-employee relationship was presaged in a law review article on the private law exception. In discussing the Massachusetts court's decision in Marshal House, Inc., the author notes: "The court clearly holds that landlord-tenant is a `civil relationship'; it would be surprising if employer-employee were to be classified differently." Schwartz, The Logic of Home Rule and the Private Law Exception, 20 U.C.L.A. L.Rev. 671, 695 (1972-1973).
[9] The jurisprudence of other states with similar constitutional provisions is to the same effect. The landlord-tenant relationship has consistently been recognized to constitute a civil relationship, See, e.g., City of Bloomington v. Chuckney, 165 Ind.App. 177, 331 N.E.2d 780, 783 (1975). In addition, family relationships have been determined to fall under the prohibition. See, City of Atlanta v. McKinney, 265 Ga. 161, 454 S.E.2d 517, 520 (1995).
[10] In so determining, I remain mindful of the court's holding in Francis v. Mortal, 455 So.2d at 1173, that exceptions to home rule powers "should be given careful scrutiny by the courts." Careful scrutiny, however, does not require the courts to construe an exception in a manner that would deny the clear import of its language or defeat its purpose. Moreover, in this instance the court is not being asked to construe the Constitution's grant of authority to local governmental subdivisions. Rather, it is being asked to construe what authority was withheld by the Constitution. Insofar as Article VI, § 9 removes specified subjects from the scope of local governmental legislative action, its exclusions must be interpreted broadly enough to accomplish their purposes.
[11] Ordinance No. 20376 specifically targets private employers and their employees, exempting from its reach city and state civil service employees and persons employed on any public works contracts governed by the Louisiana Public Bid Law.
[12] LSA C.C. art. 2670 provides that price is an essential element of the contract of lease. It explains:

To the contract of lease, as to that of sale, three things are absolutely necessary, to wit: the thing, the price, and the consent.
[13] Delegate Casey, in particular, recognized that there should be some leeway for local governments to enact legislation that might also affect civil relationships in certain areas of local concern, pointing to legislation regarding party fences as an example. See, Records, Sept. 26, Statements of Delegate Casey at 1444.
[14] National Municipal League, Model State Constitution, Section 8.02 (6th ed.1963).
[15] Professor Fordham, the author of virtually identical language in the American Municipal Association's Model Constitutional Provisions for Municipal Home Rule, explains: "This is a phase of home rule which has not generally been adequately considered. Obviously, we do not wish to give our cities the power to enact a distinctive law of contracts, for example. On the other hand, the exercise of municipal powers is very likely to have important bearings upon private interests and relationships. The approach of the [model provision] is to strike a balance by enabling home rule units to enact private law only as an incident to the exercise of some independent municipal power." Fordham, Home Rule-AMA Model, 44 Natl. Municipal Rev. 137, 142 (1955).
[16] "Dillon's Rule" is a theory pursuant to which, unless the state constitution provides otherwise, local governments have no independent power of initiation or immunity; they possess only those powers granted them by the state legislature. See, City of New Orleans v. Board of Com'rs of Orleans Levee Dist., 93-0690 at 5, 640 So.2d at 242, citing Dillon, Municipal Corporations, §§ 230, 233, 237 (5th ed.1911).
[1] The Charter was originally established by La. Acts 1912, No. 159. It is constitutionally recognized in LA. CONST. art. IX, § 22 (1921). See Hildebrand v. City of New Orleans, 549 So.2d 1218, 1221 (La.1989).
[2] The law would not apply to employees who are currently exempt from coverage under the U.S. Fair Labor Standards Act, city and state Civil Service employees, and those employed on public works contracts. The law would, however, apply across-the-board to all other private employers.
[3] Over the past decade, the living wage movement has gained support in many municipal areas. The first successful living-wage campaign began in 1994 in Baltimore, Maryland. Since then, the movement has spread to at least 39 states, 81 cities and counties, as well as universities and school boards. See, generally, Eric Roston, How Much is a Living Wage?, TIME (April 8, 2002) (hereinafter "Roston"). The city of Los Angeles, for example, enacted a minimum wage law in 1997 and Santa Monica followed suit in 2001. See id. "Typically, living wage proponents advocate a minimum wage for government contractors, those firms doing business with the government entity, or employers who receive special treatment from a city/county." George Tolley & Peter Bernstien, Economic Analysis of a Living Wage Ordinance (July, 1999), "[T]he idea behind this movement is that contractors who receive public funds should in turn be required to pay wage rates ... higher than the federal minimum wage." The Employment Policies Institute, The Employment Impact of a Comprehensive Living Wage Law: Evidence from California (July, 1999), . Consequently, most living wage ordinances only affect select businesses. See, e.g., Chicago ACORN v. City of Chicago, 1999 U.S. Dist. LEXIS 19657 (N.D. Ill. 1999) (explaining how Chicago's living wage ordinance would only require city contractors and companies that receive subsidies or tax breaks from the city to pay their employees at least $7.60 per hour when working on projects involving city business).

The City of New Orleans' Ordinance No. 20376 is unique, however, because of its across-the-board impact. Ordinance No. 20376 was passed with the intent of providing a wage that would allow workers to live decently, and provide assistance for family needs, i.e. food, shelter, etc.
[4] Established by La. Acts 1997, No. 317, LSA R.S. 23:642(B) provides in pertinent part:

[P]ursuant to the police powers ultimately reserved to the state by Article VI, Section 9 of the Constitution of Louisiana, no local governmental subdivision shall establish a minimum wage rate which a private employer would be required to pay employees.
[5] Dr. Ryan received his Ph.D. from Ohio State University, and he is a Professor of Economics at the University of New Orleans.
[6] Dr. Pollin received a Ph.D. in Economics from the New School for Social Research, New York, New York. He is a Professor of Economics at the University of Massachusetts, Amherst.
[7] From a random sample of 1,800 businesses, Dr. Pollin was able to follow up with 1,118. Letters were sent with a questionnaire, and he received a response from 424 firms (a 40% response rate).
[8] This finding validates that a disproportionate number of poor workers perform service work.
[9] Dr. Kopf has a Ph.D. in Economics from Massachusetts Institute of Technology. He is a Professor of Economics at the University of Michigan, Ann Arbor.