836 So.2d 649 (2002)
Catherine McGowan Hughes, Wife of/and Frank A. HUGHES
v.
Judy Brantley Goodreau, Wife of/and Darrell L. GOODREAU.
No. 2001 CA 2107.
Court of Appeal of Louisiana, First Circuit.
December 31, 2002.
*653 Marshall G. Weaver, Metairie, Counsel for Defendants/Appellants (Third Party) Prudential d/b/a Property Plus and St. Paul Fire and Marine Insurance.
Russell W. Rudolph, Hammond, Counsel for Defendants/Appellees (Third Party) Judy B. and Darrell L. Goodreau.
Before: KUHN, DOWNING, and *654 LANIER,[1] JJ.
KUHN, J.
Third party defendants-appellants, real estate broker Prudential Louisiana Properties d/b/a Property Plus ("Prudential") and its insurer, St. Paul Fire & Marine Insurance Company (St.Paul), appeal a judgment awarding damages in favor of third party plaintiffs-appellees, Darrell and Judy Goodreau, sellers of a house and lot, in this lawsuit filed by purchasers, who demanded relief for an alleged redhibitory defect. For the reasons that follow, the judgment is amended in part and, as amended, affirmed.

I. FACTUAL AND PROCEDURAL BACKGROUND
In November 1995, the Goodreaus sold their house and the lot upon which it was built to Catherine and Frank Hughes. The house and lot are located at 101 Chickamaw Place in the Beau Chene subdivision in Mandeville, Louisiana, adjacent to Louisiana Highway 22. At the time of the sale, the Goodreaus engaged the services of Roberta "Robbie" Broussard,[2] a sales associate of real estate broker Prudential, to list and assist in the sale of their home. And the Hugheses, who were relocating from Orange Beach, Alabama, hired Sharon Haber, also a sales associate of Prudential, to help them find a suitable home in Mandeville. After seeing the house and lot on several occasions, an offer was made by the Hugheses and accepted by the Goodreaus. Less than six months after the Hugheses moved into their new home, between one-half and one inch of water flooded the downstairs of the house following a heavy rain.
The Hugheses filed this lawsuit naming the Goodreaus as defendants, averring the property contained a redhibitory defect, and seeking rescission of the sale or, alternatively, reduction of the purchase price. The Goodreaus answered the Hugheses' lawsuit and filed third party demands against Prudential and St. Paul, among others,[3] claiming entitlement to tort damages. The Hugheses settled their lawsuit with the Goodreaus.
After a trial, the trial court concluded that the Goodreaus were entitled to damages for negligent misrepresentation and awarded $57,229.79 against Prudential and St. Paul. From a duly-signed judgment, Prudential and St. Paul appeal.
On appeal, appellants raise the following issues: (1) whether the trial court erred in concluding appellants are liable to appellees; and (2) whether appellees are entitled to all items of damages awarded by the trial court.

II. LIABILITY

A. Vicarious Liability
Appellants challenge the trial court's imposition of liability against Prudential for the actions and inactions of sales associates *655 Broussard and Haber,[4] buttressing their assertion with the contractual agreements Prudential entered into with its sales associates. According to the contract, Prudential designated itself as broker and the sales associates as independent contractors. Appellants maintain that because the sales associates are independent contractors, Prudential cannot be liable for the negligence.
The employment relationship is both a private and civil relationship. New Orleans Campaign for a Living Wage v. City of New Orleans, XXXX-XXXX, p. 11 (La.9/4/02), 825 So.2d 1098, 1117 (Weimer, J. concurring opinion). It is a private relationship because the parties to the relationship are private individuals; it is a civil relationship because it is a relationship established by the civil law. Id. The employer-employee contract is a nominate one called a lease of labor and is provided for in Louisiana Civil Code articles 2669, 2673, 2675 and 2746 et seq. Hawthorn, Waymouth & Carroll v. Johnson, 611 So.2d 645, 654 (La.App. 1st Cir.1993). Accordingly, the contract of labor is defined in our Civil Code as a form of lease. La. C.C. art. 2669; New Orleans Campaign for a Living Wage, XXXX-XXXX at p. 2, 825 So.2d at 1109 n. 1 (Calogero, C.J., concurring opinion); Voitier v. Church Point Wholesale Beverage Co., Inc., 99-1777, p. 5 (La.App. 3d Cir.4/5/00), 760 So.2d 451, 456, writ denied, XXXX-XXXX (La.9/29/00), 770 So.2d 350. A lease of labor is a synallagmatic contract, to which consent alone is sufficient, and by which one party gives to the other the enjoyment of his labor (one party binds himself to do something for the other) at a fixed price. La. C.C. arts. 2669 and 2675. Vining v. Bardwell, 482 So.2d 685, 690 (La.App. 1st Cir.1985), writ denied, 487 So.2d 439 (La.1986). The elements of a lease of labor are: (1) the thing (labor); (2) the price; and (3) the consent. La. C.C. art. 2670; Vining, 482 So.2d at 690; see Hawthorn, Waymouth & Carroll, 611 So.2d at 654. Thus, an "employee" is anyone who works for an employer and is a person working for a price (salary, wages, commission, payment for services, etc.). See Savoie v. Fireman's Fund Ins. Co., 347 So.2d 188, 191 (La. 1977); Cassey v. Stewart, 31,437, p. 8 (La. App.2d Cir.1/20/99), 727 So.2d 655, 659, writ denied, 99-0811 (La.4/30/99), 743 So.2d 209.
Accordingly, as a matter of law, an independent contractor is an employee for contractual purposes. Therefore, for purposes of the employer/employee relationship, it is irrelevant whether the employee is an independent contractor or not. In either situation, the contractual relationship is governed by the same rules. But the status becomes significant for purposes of the liability of the employer for a tort committed by an employee.
Louisiana Civil Code article 2320 states:
Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
...
In the above cases, responsibility only attaches, when the masters or employers... might have prevented the act *656 which caused the damage, and have not done it.
The master is answerable for the offenses and quasi-offenses committed by his servants, according to the rules which are explained under the title: Of quasi-contracts, and of offenses and quasi-offenses.

For an employer to be held liable for the actions of an employee under article 2320, the plaintiff must show that (1) a master-servant relationship existed between the tortfeasor and the employer, and (2) the tortious act of the tortfeasor was committed within the scope and during the course of his employment with the employer. Brumfield v. Gafford, 99-1712, p. 7 (La.App. 1st Cir.9/22/00), 768 So.2d 223, 227. Therefore, once it is determined that an employment contract exists, for purposes of the employer's vicarious liability in tort, it is necessary to determine what type of employment contract exists, i.e., whether the employee is a mere servant or an independent contractor. See Vining, 482 So.2d at 693 n. 4. The distinction between a mere servant and an independent contractor is a factual determination decided on a case-by-case basis. Tower Credit, Inc. v. Carpenter, 2001-2875, p. 6 (La.9/4/02), 825 So.2d 1125, 1129.
To determine whether the employee is an independent contractor or a mere servant, the control exercised by the employer over the employee must be examined. Hickman v. Southern Pacific Transport Co., 262 La. 102, 117, 262 So.2d 385, 391 (1972). And in our undertaking of this examination, the Hickman court explained:
It is well understood by the courts of this State that the term independent contractor connotes a freedom of action and choice with respect to the undertaking in question and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants. The relationship presupposes a contract between the parties, the independent nature of the contractor's business and the nonexclusive means the contractor may employ in accomplishing the work. Moreover, it should appear that the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered. It must also appear that a specific price for the overall undertaking is agreed upon; that its duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.
262 So.2d at 390-91.
See also Tower Credit, Inc., 2001-2875 at p. 6, 825 So.2d at 1129; Smith v. Zellerbach, 486 So.2d 798, 801 (La.App. 1st Cir.), writ denied, 489 So.2d 246 (La.1986).
It is not the actual supervision or control which is actually exercised by the employer that is significant, but whether, from the nature of the relationship, the right to do so exists. Hickman, 262 So.2d at 391; Mack v. CDI Contractors, Inc., 99-1014, p. 7 (La.App. 5th Cir.2/29/00), 757 So.2d 93, 97; Howlett v. Halpern, 559 So.2d 21, 23 (La.App. 4th Cir.), writ denied, 561 So.2d 120 (La.1990).
In Tower Credit, Inc., the Louisiana Supreme Court directed:
[T]he following factors [are] relevant in determining whether the relationship of principal and independent contractor exists: (1) there is a valid contract between the parties; (2) the work being done is of an independent nature such that the contractor may employ non-exclusive *657 means in accomplishing it; (3) the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction of the principal, except as to the result of the services to be rendered; (4) there is a specific price for the overall undertaking agreed upon; and (5) the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.
2001-2875 at p. 6, 825 So.2d at 1129.
In Guidry v. Freeman, 555 So.2d 588 (La.App. 1st Cir.1989), the relationship between the employee and employer was terminable at the will of either party; the employer provided liability insurance as well as worker's compensation insurance for the employee; the employee was paid on a regular basis by checks issued from the employer's office; the employee's activities and operations were limited solely to the employer's business; and the employee was expected to follow and enforce all of the employer's policies. In that case, the court held that the employee was not an independent contractor but the type of employee for whom the employer was vicariously liable.
In Kamm v. Morgan, 157 So.2d 118 (La.App. 4th Cir.1963), the employer and employee entered into a verbal agreement by virtue of which the parties agreed that the employer would furnish insecticide and use of its name to procure pest control contracts. The employee, in turn, was to service the accounts using his own plane to do so. In exchange for the use of its name and billing facilities, the employer received 15% of the gross income emanating from the contracts received by the employee. The employer did not withhold income or social security taxes from the employer's share, and did not carry him as an employee on its income tax returns. The employee was required to furnish service at stated intervals to customers, but he planned his own work schedule. Also, the president of the employer signed the contracts with the customers. But it was the employee who actually determined the price for which the services were rendered. And each party possessed the right to terminate the relationship at will. In that case, the court held that the employee was an independent contractor and not a mere servant for which the employer would have been vicariously liable.
The contract between Prudential and Broussard and Haber is one of mandate. Mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal. La. C.C. art. 2989.[5] The contract of mandate may be either onerous or gratuitous. La. C.C. art. 2992.[6] The contract of mandate and the contract of employment are not mutually exclusive. Three things are absolutely necessary for a lease of labor: (1) the thing (labor); (2) the price; and (3) the consent. La. C.C. art. 2670. When a contract of mandate is onerous an employment relationship (lease of labor) exists between the principal and the mandatary; when the contract of mandate is gratuitous, no employment relationship exists between the principal and mandatary because no price has been paid. However, the existence of an employment relationship between the principal and mandatary does not necessarily subject the principal to liability under Louisiana Civil Code article 2320.
*658 In Blanchard v. Ogima, the Louisiana Supreme Court stated:
Although a servant may possess the qualities of [a mandatary], all [mandataries] do not qualify as servants. The master-servant relationship cannot be equated with the principal-[mandatary] relationship. Employer-employee status May [sic] be included within the master-servant relation, but principal-[mandatary] status Cannot [sic] unless the [mandatary] is also a servant. Neither jurisprudence nor modern commerce will allow us to define `servant' as one who does only physical acts. `Servant' must be interpreted as that particular kind of [mandatary] who Has [sic] a very close economic relation to, and is subject to very close control by, the principal. A servant is one who offers his personal services for a price. He is an integral part of his employer's business and must submit to the control of his physical conduct as well as of his time. A non-servant [mandatary] contributes to the business of his employer, but he is not such a part of it that his physical acts and the time to be devoted to the business are subject to control.
253 La. 34, 215 So.2d 902, 906-07 (1968).
To determine the principal's liability under article 2320 the inquiry, therefore, is: (1) Was there an employment relationship between the principal and mandatary? For this to be true, the contract of mandate must be an onerous one; (2) If there is an employment relationship, is the mandatary a mere servant or an independent contractor? And in reaching this conclusion, we are guided by the Tower Credit, Inc. factors.
In Blanchard, the principal had little or no control over the mandatary's sales contacts or methods, and the mandatary was only compensated by a commission. In addition, the principal did not have the right to control the physical movements of the mandatary or to require a specific allotment of time by the mandatary for the principal's benefit. No fixed salary or payment for services was rendered, and compensation was dependent upon the results obtained, not the services rendered. The only control that the principal exercised was the imposition of a requirement that the mandatary obtain at least a fixed minimum sum for the car he was selling. The principal did not determine to whom the sale was made, the time spent in effectuating the sale, or the place of sale. And the principal could not control any of the details of the mandatary's physical conduct in effectuating the sale. The Louisiana Supreme Court held that the mandatary was not the servant of the principal but an independent contractor for whose negligence the principal was not vicariously liable. 215 So.2d at 902.
It is only when the relationship of the parties includes the principal's right to control physical details of the actor about the manner of his performance, which is characteristic of the relation of master and servant, that the person in whose service the act is done becomes subject to liability for the physical tortious conduct of the actor. Rowell v. Carter Mobile Homes, 500 So.2d 748, 751 (La.1987).
In Hickman, the employee's sole source of employment was with the employer. The employee could not radically vary his methods or patterns of work without provoking a reprimand or disciplinary action by the employer. But the Louisiana Supreme Court found the most telling facts defining the relationship as master-servant (rather than that of employer-independent contractor) were that the contract between the parties could be terminated by either party upon written notice to the other without incurring liability for breach; and that the employer had the *659 right to terminate the relationship at any time when the employee's services became unsatisfactory to the employer. 262 So.2d at 390-91. The Hickman court stated "[t]his right to terminate the relationship without cause, where no term of employment is prescribed, is characteristic of the master and servant ... relationship" and "[this] right is at the same time antagonistic to the independent contractor relationship." 262 So.2d at 391.
In the case presently before us, clearly a contract of mandate existed between Broussard and Haber and the principal (Prudential). There was also an employment contract between these parties. The mandataries worked on a set commission and, thus, a specific price for the undertaking was agreed upon. Therefore, we must determine whether the mandataries were independent contractors or mere servants.
Although the parties entered into a written contract in which Broussard and Haber were identified as independent contractors, and this designation may have some validity between the parties, it is not binding or controlling on the rights of third persons. The rights of third persons are controlled by the substance, rather than the title, of the contractual relationship between the parties. See Monsanto Co. v. St. Charles Parish School Bd., 94-2145, pp. 5-6 (La.2/20/95), 650 So.2d 753, 756-757; see also DeFelice v. Garon, 395 So.2d 658, 659 (La.1980). Prudential neither dictated the number of hours the associates had to work nor the properties for which they were responsible. And Prudential did not direct the associates on how to spend their time at work. Conversely, the testimony established that the associates worked exclusively for Prudential, and as in Hickman, were not free to carry out their work using their own methods because their written employment contract required that they "comply with the Policy and Procedures Manual prepared by Broker." The associates were required to attend an introductory orientation on Prudential's policies and procedures. Their referrals were considered the property of Prudential. And finally, according to their respective contracts with Prudential:
This Agreement and the affiliation created hereby shall terminate on December 31 of the year in which it is executed; provided, however, this Agreement and affiliation may be terminated:

(a) by either party at any time on reasonable written notice given to the other party; or
(b) by Broker immediately upon delivery of notice to Independent Contractor that Independent Contractor has failed to comply with any of the terms or conditions of this Agreement including, without limitation, the misuse, or use not in compliance with then existing standards, of the name licensed herein. (Emphasis added.)
Thus, as in Hickman, while the parties could terminate the relationship upon written notice without incurring liability for breach, Prudential also retained the right to immediately terminate an associate for breach of contract. For these reasons, we conclude that Broussard and Haber were not independent contractors of Prudential but mere servants for whom Prudential is vicariously liable to third persons under La. C.C. art. 2320.[7]

*660 B. Theory of Recovery
Appellants challenge the trial court's imposition of liability against Prudential by urging that appellees' recovery is limited to contractual indemnity for the rights they obtained from the Hugheses in settling the lawsuit with them.
A real estate broker is a professional who holds himself out as trained and experienced to render a specialized service in real estate transactions. The broker stands in a fiduciary relationship to his client and is bound to exercise reasonable care, skill, and diligence in the performance of his duties. Mallet v. Maggio, 503 So.2d 37, 38 (La.App. 1st Cir.), writ denied, 504 So.2d 880 (La.1987). Generally, a broker's duties are limited to those which can be analogically drawn from La. R.S. 37:1455[8] and from the customs and practices of real estate brokers in general. Id. Ultimately the precise duties of a real estate broker must be determined by an examination of the nature of the task the real estate agent undertakes to perform and the agreements he makes with the involved parties. Id. at 38-39. The failure to disclose to a buyer a known material defect regarding the condition of real estate of which the broker or salesperson has knowledge is among a broker's duties analogically drawn from La. R.S. 37:1455 and from the customs and practices of real estate brokers in general. See La. R.S. 37:1455A(27).
While the trial court's factual findings are reviewed by this court for manifest error, see Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882-83 (La.1993), whether a duty is owed is a question of law. Barrie v. V.P. Exterminators, Inc., 625 So.2d 1007, 1015 (La.1993). A realtor has a fiduciary duty to his client and a breach of that duty to the client is actionable under La. C.C. art. 2315. Avegno v. Byrd, 377 So.2d 268, 274 (La.1979). Thus, where a realtor violated La. R.S. 37:1455, he breached his fiduciary duty to his client and an award of damages under La. C.C. art. 2315 was held to be appropriate. A realtor's liability includes the amount the client incurred in defending the underlying litigation as well as general damages. See Avegno, 377 So.2d at 273-74.
At the heart of this dispute was a disclosure addendum form, which the parties introduced into evidence.[9] Prudential supplied the form, and Darrell Goodreau responded to the form's questions for the Goodreaus. Noted additions were made by Broussard in her own handwriting, and the Goodreaus and the Hugheses signed the pre-printed addendum form.
Darrell Goodreau testified that when filling out Prudential's pre-printed disclosure addendum form, he indicated with an affirmative response that the house and the lot had flooded. He provided Broussard several letters further explaining the nature of the flooding problem. Broussard *661 wrote at the bottom of the list of questions, which provided various potential problems property might have, "See attached documents." And Broussard referenced question # 3 ("Has the lot/land ever flooded?") and question # 4 ("Has the home and/or outdoor buildings ever flooded?") to the "See attached documents" notation. Goodreau stated that in response to question # 5, inquiring whether the property had any drainage problems, he responded "NO." He added that he believed he initially answered "YES," indicating there was a drainage problem, but later changed that answer to "NO."
It is undisputed that Broussard's handwritten notation, "See attached documents," referenced six letters the Goodreaus had provided to her. The Hugheses' respective deposition testimony, in conformity with one another, indicated that Catherine, a retired, licensed realtor, and Frank saw only two of the six letters. Catherine Hughes remembered that the disclosure addendum form was attached to the purchase agreement, and stated that Haber wanted to be sure that Hughes read the disclosure addendum at the time she signed the purchase agreement. In considering whether to purchase a house that had flooded in the past, the two letters provided to the Hugheses, when read together with the disclosure addendum form representations, led the Hugheses, to reason as Catherine testified:
the disclosure [addendum form] had the statement of [Darrell] Goodreau that [the house] had flooded one time, and the problem that caused the flood was the 100-year flood, and that the ditch behind the house had been corrected and the problem no longer existed.
According to the Hugheses, they never discussed the issue of drainage with Haber. And they did not discuss drainage with the Goodreaus, although a conversation about water marks in the garage, a building set off from the house, was recalled by both Frank Hughes and Darrell Goodreau. Frank Hughes explained that the water marks in the garage, which was located closer to Louisiana Highway 22, were consistent with a house which sat on higher ground that had flooded one time.
Among the four documents the Hugheses testified they were not shown prior to the purchase of the property was a letter written on June 26, 1995, by Morgan Earnest, President of the Beau Chene Homeowners Association, to State Representative M.P. "Pete" Schneider setting forth concerns of Beau Chene "homes flooding in this area along Hwy. 22." The letter requests help from the state representative "including the provision of good drainage." It states:
There is a long history of discussion and correspondence regarding the ditch [adjacent to Louisiana Highway 22]. We have worked with Louisiana [Department of Development and Transportation ("DOTD") ] and the parish trying to improve drainage ....
Nine homes along [Louisiana Highway 22] and seven homes within the community have received water from the ditch or from drainage overtaxed by water from the ditch. Several received water in April. One has received water seven times since the highway widening in 1993.
The other documents the Hugheses testified they were not shown the disclosure addendum form included a June 16, 1995 letter from Earnest to representative Edward J. Deano noting a flooded home; a letter dated June 29, 1995, from DOTD District 62 Administrator Maurice Jordan to Earnest that noted a recent meeting whose purpose "was to discuss and explore possible solutions to drainage problems experienced by residents in Beau Chene *662 Subdivision," and outlined several possible improvements that DOTD "believe[d] the residents in Beau Chene [would] appreciate... toward improving this drainage"; and a letter from Earnest to "Beau Chene Homeowners Association Members Affected by Highway and Bayou Drainage."
Broussard admitted she had received the six documents in conjunction with Darrell Goodreau's representations that the house, lot, and buildings had flooded, explaining that she placed the documents in the office file at the Prudential main office. She testified that, in addition, the documents provided to her by the Goodreaus along with the disclosure addendum form were located in the kitchen of the house for potential buyers to review. Broussard did not personally provide the documents to the Hugheses, she said, because she did not represent them. According to Broussard, the six letters, coupled with the Goodreaus' representations in the disclosure addendum, gave her the impression that the problems that created the flooding event in May 1995 had been corrected.
Haber stated that she gave all the documents to which she had access to the Hugheses. She could not recall exactly where she had obtained the disclosure addendum form with the attached documents but indicated it would have either been from the Prudential office file, Broussard, or at the house. She recalled that there were some papers in the kitchen but was uncertain whether that was where she had received the disclosure addendum form with the attached documents that she ultimately gave to her clients. Although at trial, Haber testified that she could not recall exactly which documents had been attached to the disclosure addendum form that she provided to the Hugheses, she was confronted with earlier deposition testimony wherein she acknowledged that she had not seen either the June 26, 1996 letter from Earnest to State Representative Schneider or the letter from Earnest to those members of the homeowners association affected by highway and bayou drainage.
The trier of fact was free to reject Broussard's testimony to the contrary and conclude from Catherine and Frank Hughes' deposition testimony, as well as Haber's testimony, that only two of the six documents supplied to Broussard by the Goodreaus were actually attached to the disclosure addendum form that Haber provided to the Hugheses. The undisputed evidence establishes that Broussard received six letters from the Goodreaus and she wrote "See attached documents" on the disclosure addendum form. Thus, through the actions or inactions of its employees, Broussard and Haber, Prudential failed to disclose to the Hugheses a known material defect regarding the drainage problem affecting the house and lot at 101 Chickamaw Place created by Louisiana Highway 22. Therefore, the record supports a finding that Prudential violated La. R.S. 37:1455A(27), thereby breaching its fiduciary duty to exercise reasonable care and skill in the performance of its duties as the Goodreaus' broker.
Cause-in-fact is generally a "but for" inquiry. If plaintiff probably would not have been injured but for the defendant's substandard conduct, such conduct is a cause-in-fact of resulting harm. See Williams v. Dean, 96-1481, p. 13 (La.App. 1st Cir.5/9/97), 694 So.2d 1195, 1202.
The Hugheses unequivocally stated that had they seen the June 26, 1995 letter from Earnest to State Representative Schneider prior to their offer to purchase the property, they would not have purchased the property and would have made further inquiries about the drainage situation. This establishes that but for Prudential's failure to disclose the *663 known drainage problem, the sale of 101 Chickamaw Place to the Hugheses would not have been entered into, and this resulting lawsuit would not have ensued. Thus, under the facts of this case, violation of La. R.S. 37:1455A(27) by Prudential's employees Broussard and Haber supports the trial court's imposition of delictual liability against Prudential under La. C.C. art. 2315. See Avegno, 377 So.2d at 274.
The trial court determined that the basis of Prudential's liability to the Goodreaus was founded under a theory of negligent misrepresentation. See La. C.C. art. 2315; see Duplechin v. Adams, 95-0480, p. 5 (La.App. 1st Cir.11/9/95), 665 So.2d 80, 84. In order for a plaintiff to recover for negligent misrepresentation, there must be a legal duty on the part of the defendant to supply correct information, a breach of that duty, and damage to plaintiff caused by the breach. Merlin v. Fusilier Constr. Inc., XXXX-XXXX, p. 10 (La. App. 5th Cir.5/30/01), 789 So.2d 710, 717; Duplechin, 95-0480 at p. 6, 665 So.2d at 84. And a real estate broker or agent owes a specific duty to communicate accurate information to the seller and the purchaser and may be held liable for negligent misrepresentation. Merlin, XXXX-XXXX at p. 10, 789 So.2d at 717; Duplechin, 95-0480 at p. 6, 665 So.2d at 84. Plaintiff must show damages as a result of his justifiable reliance on the defendant's misrepresentations. Busby v. Parish Nat'l Bank, 464 So.2d 374, 377 (La.App. 1st Cir.), writ denied, 467 So.2d 1132 (La. 1985).
Even if we were to assume that the Hugheses were victims of negligent misrepresentation by Prudential, lacking all the terms of the settlement, the record fails to establish the Hugheses, in settling with the Goodreaus, subrogated all their claims, including any cause of action in negligent misrepresentation, to the Goodreaus.
Most instances of recovery for negligent misrepresentation against a realtor in Louisiana, have been in favor of the purchaser, not the seller. See e.g., Ernestine v. Baker, 515 So.2d 826 (La.App. 5th Cir.1987); Josephs v. Austin, 420 So.2d 1181, 1185 (La.App. 5th Cir.1982), writ denied, 427 So.2d 870 (La.1983). Louisiana's case-by-case development of the tort of negligent misrepresentation has not been restricted to a set theory. Barrie, 625 So.2d at 1016. It has been broadly used to encompass situations of non-disclosure in fiduciary relationships to situations of direct disclosure to non-clients. See Barrie, 625 So.2d at 1015-16. Adopting one of the common law standards as the sole method for determining liability for this tort is not necessary. The case-by-case application of the duty/risk analysis, presently employed by our courts, adequately protects the misinformer and the misinformed because the initial inquiry is whether, as a matter of law, a duty is owed to this particular plaintiff to protect him from this particular harm. Id.
While there is jurisprudence suggesting that recovery for breach of a legal duty to communicate accurate information to the seller and the purchaser runs in favor of the seller, see e.g., Merlin, XXXX-XXXX at p. 10, 789 So.2d at 716-17, in this case, the evidence more appropriately supports the imposition of liability in favor of the Goodreaus within the ambit of Prudential's fiduciary relationship to its clients. There is no evidence of a misrepresentation uttered or performed by Prudential upon which the Goodreaus relied to their detriment. Broussard failed to attach the documents to the disclosure addendum form as she indicated she would. And it would not have been until she failed to do so that any "misrepresentation" arose. Under the facts of this case, we believe the record *664 more squarely supports the imposition of liability against Prudential in favor of the sellers on the basis of breach of its fiduciary duty rather than under a theory of negligent misrepresentation. But see and compare Busby, 464 So.2d at 378 (wherein after finding no resulting injury to plaintiff by the alleged misrepresentation, the court assumes but does not hold that the failure of defendant bank to complete and submit a form in connection with plaintiff's Small Business Administration-guaranteed loan application constitutes a misrepresentation).
Thus, the trial court's conclusion that under La. C.C. art. 2315 Prudential caused tortious harm to the Goodreaus, which gives them their distinctive right to pursue damages outside the principles of indemnity, is correct.[10]

III. DAMAGES
Appellants levy complaints at several items of damages the trial court awarded the Goodreaus, including the quantum of the general damages.
One injured through the fault of another is entitled to full indemnification for the resulting damages. Wainwright v. Fontenot, 00-0492, p. 5 (La.10/19/00), 774 So.2d 70, 74. The trier of fact is given much discretion in the assessment of damages. La. C.C. art. 2324.1. And upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. See Wainwright, 00-0492 at p. 6, 774 So.2d at 74.
Specifically, Prudential and St. Paul urge that the amount of $22,350.00 awarded as the difference between the purchase price originally tendered by the Hugheses and the amount the Goodreaus paid to repurchase the house from the Hugheses in settling the redhibition lawsuit was erroneous. They suggest inter alia entitlement to a credit of $4,000.00 for rental revenues they aver the Goodreaus collected while title owners of two houses.
Insofar as the claim of entitlement to a $4,000.00 credit, Judy Goodreau testified that although a rental agreement had been entered into for the lease of the property, because of a heavy rain on the day the prospective tenants were scheduled to move into the house and lot at 101 Chickamaw Place, they never did. Judy Goodreau recalled that a $4,000.00 deposit was held by the realtor who negotiated the lease and denied having received it. No evidence to the contrary was offered. Thus, the trial court was free to decline to credit that amount to Prudential.
Addressing the complaints directed at the trial court's award of *665 $22,350.00, we initially note that the Goodreau's cause of action arises out of the Hugheses' redhibition claim. A redhibitory action is one between a seller and buyer. See Duplechin, 95-0480 at p. 5, 665 So.2d at 84. The existence of a redhibitory defect is a factual determination. See Merlin, 00-1862 at p. 7, 789 So.2d at 715. Implicit in the trial court's conclusion of liability is a finding that the drainage problems constituted a redhibitory defect, which is not manifestly erroneous. The assertion by appellants that the Goodreaus did not have had any direct liability to the Hugheses and, thus, did not have any basis to enter into a settlement with the Hugheses is, therefore, without merit.
According to the testimony of Darrell Goodreau, the terms of the settlement of the lawsuit filed against them by the Hugheses required that they repurchase the house and lot. The evidence shows that the Hugheses paid $177,500.00 to acquire the property. And to settle the redhibition claim, the Goodreaus tendered approximately $199,850.00, which included approximately $196,500.00 for the repurchase.[11] Thus, the trial court's award of ($196,500.00$177,500.00) $22,350.00, supported by this testimonial and documentary evidence, reflects its conclusion that the Goodreaus were entitled to reimbursement of the settlement proceeds they paid to compromise the Hugheses' redhibition claim.
Louisiana Civil Code article 2545 states:
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees.
The Goodreaus (sellers) knew of the flooding and their mandatary failed to properly inform the Hughes (buyers) of the defect. Accordingly, under La. C.C. art. 2545, the Goodreaus (as sellers) were obligated to (1) return the purchase price to the Hughes, (2) pay interest from the date of sale, (3) reimburse costs of the sale and preservation of the property, and (4) pay a reasonable attorney fee. The original sale from the Goodreaus to the Hughes took place on November 20, 1995; the date of settlement was March 27, 2000. Just the legal interest from the date of sale to the date of settlement was approximately $63,139.03. Thus, the settlement saved the Goodreaus more than $40,000.00 just from their interest exposure, and Prudential benefited. And under these facts, an additional $20,000.00 attorney fee would not have been unreasonable. Clearly, under the facts of this case, there is no error in the trial court's determination that the Goodreaus are entitled to an award of just $22,350.00, the actual amount of the settlement they incurred in this lawsuit.[12]
*666 Appellants assert the trial court erred in awarding $3,085.00 for expenses of cleaning and repairing the property after the repurchase.
Louisiana Civil Code article 2532 states in pertinent part:
A buyer who obtains rescission because of a redhibitory defect is bound to return the thing to the seller, for which purpose he must take care of the thing as a prudent administrator ....
Mrs. Goodreau testified that the house needed a lot of cleaning and repairing when they repurchased the property. But the record shows that the Hughes, who were the administrator's of the property which contained the redhibitory defect, were responsible for these damages, not Prudential. And there is no evidence in the record to show these expenses were included in the settlement. Thus, we conclude the trial court erred as a matter of law in awarding the total amount of $3,085.00 because the record fails to establish that Prudential's negligence was responsible for all of this damage. But because the record shows that $1,368.00 of $3,085.00, awarded for utilities and Beau Chene Homeowner's fees that the Goodreaus had to pay while they were not living in the house after repurchase, were expenses caused by the negligence of Prudential, we conclude the Goodreaus are entitled to recover this portion of the award. Accordingly, we amend the judgment, reducing this award from $3,085.00 to $1,368.00.
Appellants maintain that an award of $1,386.83 for the costs the Goodreaus incurred in defending the Hugheses' claims against them constituted an impermissible award of attorney's fees. The record shows that the total of $1,386.83 for legal costs consisted of $910.33 in court costs and $476.50 for a deposition that Judy Goodreau explained were incurred by them in defending against the Hugheses' redhibition claims. No countervailing evidence was introduced into the record. The trial court's reliance on Judy Goodreau's testimony to award these items of damages was not erroneous.
The action by the Goodreaus against Prudential arose out of a contractual breach of a fiduciary duty and, thus, general damages were recoverable. See Avegno, 377 So.2d 268. And the standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what suffices to justify modification of a generous or stingy award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The trial court awarded the Goodreaus $5,000.00 in general damages. This amount was not an abuse of discretion under the facts of this case. Both Darrell and Judy testified to the degree that the ensuing litigation burdened their lives. Judy Goodreau explained that they had never sued anyone and, before this lawsuit, had never been sued. She said that in the couples' thirty-five year marriage, the litigation was probably their most difficult time. Darrell and Judy described the mental, physical, and financial toll the events occurring after the filing of this lawsuit had on them. The trial court's award of $5,000.00 to the Goodreaus is not an abuse of discretion.

*667 IV. CONCLUSION
For all these reasons, the trial court's judgment in favor of third party plaintiffs, Darrell and Judy Goodreau against third party defendants, Prudential and St. Paul is amended from an award of $57,229.79 to an award of $55,512.79, reflecting deletion of $1,717.00 of the $3,085.00 awarded for expenses the Goodreaus incurred cleaning and repairing the property after repurchase. In all other respects it is affirmed. Appeal costs are assessed against Prudential Louisiana Properties d/b/a Property Plus, Inc. and St. Paul Fire and Marine Insurance Company.
AMENDED IN PART AND, AS AMENDED, AFFIRMED.
DOWNING, J., concurs in part, dissents in part and assigns reasons.
DOWNING, J., concurs in part, dissents in part and assigns reasons.
I concur that Prudential is liable for damages, though for reasons other than those asserted by the majority. I dissent from the imposition of general damages and damages beyond the purchase price of the house at issue.

LIABILITY
A. Independent Contractor Status
The majority here essentially concludes that real estate brokers are employers who can be held vicariously liable for acts of their agents where brokers retain the right to terminate the relationship on reasonable notice or for violating its policies and procedures. Apart from the havoc the majority's dicta may cause in the real estate industry, and in any industry that depends on independent contractor agents to conduct business, such conclusion is unsupported by the record.
In Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385, 391, the Louisiana Supreme Court recited that the "principal test" to determine whether a relationship is that of independent contractor or that of mere servant is the control over the work reserved by the employer. In this regard, the only evidence cited by the majority in support of the Prudential agents being servants rather than independent contractors is that they were required to "`comply with the Policy and Procedures Manual prepared by Broker."' But there is no evidence in the record regarding what these policies and procedures were and whether they in any way impinged on the agents' rights to act independently. By analogy under the majority's reasoning, an electrical contractor could be considered an employee, making his employer vicariously liable, because the employer provided plans and diagrams for the contractor to follow.
The majority next focuses on the mutual right of the agents and Prudential to terminate their agency agreements on reasonable written notice and Prudential's exclusive right to terminate the relationship on an agent's failure to comply with the terms and conditions of the employment agreement. In this regard, the fifth prong of the Tower Credit test includes whether the agent is "subject to termination or discontinuance at the will of either side without a corresponding liability for its breach." (Emphasis added.) Tower Credit, Inc. v. Carpenter, 01-2875, p. 6 (La.9/4/02), 825 So.2d 1125, 1129. Accord Hickman, 262 So.2d at 390-391.
Here, while either party has the right to terminate their contractual relationship, nothing in the "Independent Contractor Agreement" precludes recovery of damages for breach. Nothing in the agreement provides that agents would forfeit *668 their commissions or otherwise be unable to collect any damages they could prove.
Accordingly, I disagree that the Hugheses have proven that the agents were Prudential's servants rather than independent contractors.

B. Apparent Authority
I do conclude, as did the trial court,[1] that the relationship between the agents and Prudential was one of apparent authority. As the Louisiana Supreme Court instructed in Boulos v. Morrison, 503 So.2d 1, 3 (La.1987) regarding the pre-1997 law:
For the doctrine of apparent authority to apply, the principal must first act to manifest the alleged agent's authority to an innocent third party. Second, the third party must rely reasonably on the manifested authority of the agent. As the Courts of Appeal have correctly held, the principal will be bound for the agent's actions if the principal has given an innocent third party a reasonable belief the agent had authority to act for the principal.
And the facts in the record establish that Prudential manifested its apparent agents' authority through its authorized forms and practices. As a particular example, in the listing agreement, the broker and agent executed the agreement, apparently binding Prudential to the agreement's terms. All forms and documentation reflected Prudential, not the agents, as the principal involved. Nothing in the record shows that either the Hugheses or the Goodreaus were given any notice of the agents' independent contractor status. Accordingly, the facts reflect and the court apparently accepted that the buyer and seller relied on this manifest authority, and such reliance was reasonable.
The trial court found that Prudential's negligence, through its agents, in failing to "transmit complete and accurate information" was the cause of the Goodreaus' damages. This finding is not manifestly erroneous under the facts adduced in this record. I therefore agree that Prudential is liable for the damages it caused. As discussed following, however, I do not agree that all damages awarded are properly attributable to Prudential.

DAMAGES
The majority premises the affirmation of damages beyond the purchase price and for general damages on an implicit finding the trial court did not make, confusing the elements of a claim for redhibition with the elements of a claim for breach of fiduciary duty. The majority here concluded: "[I]mplicit in the trial court's conclusion of liability is a finding that the drainage problems constituted a redhibitory defect ...." But the record does not reflect that the trial court considered the existence of a redhibitory defect. In its written reasons, the trial court concluded that Prudential was liable because it "negligently failed to transmit complete and accurate information to the Hughes sufficient to allow them to make an informed decision regarding the purchase." (Emphasis added.) The majority errs in equating a property owner's liability for failure to "transmit complete and accurate information" (giving *669 rise to a claim for breach of fiduciary duty) with the owner's liability under La. C.C. art. 2545 when he knows of but fails to disclose a redhibitory defect.
Here, in its effort to fully indemnify the Hugheses, the majority looks to redhibition principles to evaluate the extent of their damages. But before a buyer can collect interest, expenses of a sale and for preservation of a thing, damages and attorney fees under La. C.C. art. 2545, he must prove the owner knew of the defect and failed to declare it. Further, under La. C.C. art. 2521, "[t]he seller owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things."
Here, the majority finds facts on issues that were not considered or developed in the trial court when it concludes the existence of a redhibitory defect. Accepting this, it is undisputed that the Goodreaus disclosed to the Hugheses that the home on the property had flooded once. There is no evidence in the record that the home had flooded more than once prior to the Hugheses' purchase. There is no evidence in the record that the Goodreaus knew the home would flood again or that their efforts and the efforts of others to improve the yard drainage would be ineffective. Regarding the drainage, the record indicates that the Hugheses were informed in the disclosure that efforts were undertaken to improve the drainage, but there was no representation that the yard drainage problems had been resolved. Further, the record indicates that flooding in the garage, which sat at a lower elevation, left water marks. These water marks should have put the Hugheses on notice that the yard flooded.
Accordingly, the record does not support any "implicit" finding by the majority that the Goodreaus knew that the home would flood further or that they knowingly failed to disclose a redhibitory defect. Without such knowing omission, the Hugheses damages for any redhibitory defect that renders a thing useless would be limited to rescission, expenses of the sale and expenses for preservation of the property. La. C.C. art. 2531.
Further, under La. C.C. arts. 3016 and 3017 in effect at the times in issue provided that Prudential was the mandatory of both the Hugheses and the Goodreaus and was obligated to both. Therefore, the Goodreaus' full disclosure to Prudential should be imputed to the Hugheses. Prudential's liability here flows from its breach of its duty to communicate this information to the Hugheses.
Regarding the $22,350.00 difference in the purchase price awarded, there is no evidence in the record that this sum was allowable in redhibition and there is no evidence that this sum was attributable to Prudential's negligence. The settlement states that this was a compromise sum. And I cannot hold Prudential liable for this amount without some proof that it caused this amount of damage.
Regarding the $5,000 general damage award, these are not generally permissible. As this court stated in Louisiana Farm Bureau Mut. Ins. Co. v. Dunn, 484 So.2d 853, 856 (La.App. 1 Cir.1986):
It is ... well settled that an award for mental anguish as a result of damage to property is normally permitted in but four instances; (1) property damaged by an intentional or illegal act; (2) property damaged by acts for which the tortfeasor will be strictly or absolutely liable; (3) property damaged by acts constituting a continuous nuisance; and (4) property damaged at a time which the owner thereof is present or situated nearby *670 and the owner experiences trauma as a result. (Citations omitted.)
There is no provision in Louisiana law that allows recovery of general damages for the worry and anguish associated with litigation or ordinary stresses of life.
Accordingly, I dissent from these elements of damages. The other damage awards, however, seem to result from Prudential's breach of duty and are properly awardable.
NOTES
[1] The Honorable Walter I. Lanier, Jr., Judge (retired), First Circuit Court of Appeal, is serving as judge ad hoc by special appointment of the Louisiana Supreme Court.
[2] Although Ms. Broussard subsequently remarried and was known by the surname "Voohries" on the date of trial, throughout this opinion she is referred to by the name by which she was known on the date of the sale of the property.
[3] The Goodreaus also named the developer of the subdivision, its insurer, and the State through the Department of Transportation and Development. These claims were apparently settled prior to trial. Sales associates Broussard and Haber were not named as third party defendants in their respective individual capacities.
[4] This matter arose prior to the enactment of Chapter 4 of Code Title XV of Title 9, entitled "Agency Relations in Real Estate Transactions," which is presently set forth in La. R.S. 9:3891-3899 (providing for the duties and liabilities between agents, clients, and other people involved in real estate transactions). See La. Acts 1997, No. 31, effective March 1, 1998. La. R.S. 9:3899, entitled "Vicarious liability," provides that a client (either a buyer or a seller) shall not be liable for the acts or omissions of a real estate licensee in providing brokerage services for or on behalf of the client.
[5] See Louisiana Civil Code article 2985 prior to the 1998 revisions.
[6] See Louisiana Civil Code article 2991 prior to the 1998 revisions.
[7] We note that in addition to the vicarious liability imposed on Prudential for the tortius conduct of its associates, as a broker for the Goodreaus and the Hughes, Prudential was also directly liable to the Goodreaus under La. C.C. arts. 3003, 3016, 3017, 3018 and 3020 (pursuant to the respective versions in effect at all relevant times).
[8] Although consistent with its cite to Leggio v. Realty Mart, Inc., 303 So.2d 920, 923-24 (La. App. 1st Cir.1974), writ denied, 307 So.2d 629 (La.1975), the Maggio court references a broker's duties as "analogically drawn from La. R.S. 37:1454." But by La. Acts 1978, No. 514, § 1, the legislature amended and reenacted La. R.S. 37:1431 to 37:1462. Therefore, this opinion refers to the subject matter of former section La. R.S. 37:1454 after the 1978 amendment and reenactment, i.e., as La. R.S. 37:1455.
[9] Although each party introduced a copy of the disclosure addendum, neither is fully legible. But gleaning from an examination of both copies in evidence, we find sufficient information to address appellants' contentions involving the disclosure addendum.
[10] St. Paul's contention, without denying coverage, that the failure of the Goodreaus to place the policy issued to Prudential into evidence precludes a judgment against St. Paul also fails. In its responsive pleadings, St. Paul failed to deny "at all times relevant hereto, [it] maintained in full force and effect a policy of insurance covering the acts and omissions of [Prudential] and/or any of its ... agents," alleged by the Goodreaus, thereby admitting that allegation. See La. C.C.P. art. 1004. Therefore, the policy did not need to be entered into evidence to cast St. Paul in judgment. Alternatively, appellants assert the trial court's failure to assess any comparative fault to the Goodreaus was erroneous. The trial court's apportionment of fault is a factual finding subject to the manifest error rule. Gibson v. State, Through Dep't of Transp. and Dev., 95-1418, p. 12 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1005, writs denied, 96-1862, 96-1895, 96-1902 (La.10/25/96), 681 So.2d 373, 374. An evidentiary basis exists for the trial court's factual determination that Prudential, who earns its living buying and selling real property, was 100% at fault and, therefore, is not manifestly erroneous. See Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989).
[11] Citing values set forth in appraisals, appellants question the underlying value of the house and lot. The trial court obviously concluded that the amount of $196,500.00 reasonably reflected the value of the house, and on appeal we cannot reweigh factual conclusions fully supported by the evidence. See Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882-83 (La.1993). Appellants' valuation complaints are without merit.
[12] Appellants' assertion, without authority, that they were entitled to a prior tender of the terms of the settlement, ostensibly with the power to accede to or disapprove the conditions lacks merit. When the settlement was perfected, appellants' position in this lawsuit was that they had no liability to anyone. Under the facts of this case, we decline to downwardly adjust the quantum awarded by the trial court on the basis that it included the difference between the original purchase price and the repurchase amount actually paid to the Hugheses for release from the redhibition claims.
[1] In its oral reasons at the end of the trial, the trial court found as follows regarding the basis of Prudential's liability: "the court finds that these agents were held out to be representatives of Prudential. And, therefore, the Court finds that Prudential is responsible for any acts that their agents may nave set loose in connection with the facts surrounding this case." In its written reasons, the trial court reiterated that, "Prudential held Ms. Broussard and Ms. Haber out to be representatives of Prudential and therefore Prudential is responsible for the acts of its employees under the theory of respondeat superior."