GAIDRY, J.
|2In this suit involving injuries resulting from an automobile accident, the plaintiff appeals a summary judgment dismissing her claims against two defendants. We affirm.
FACTS AND PROCEDURAL HISTORY
This suit arises from a December 10, 2007 automobile accident which occurred when a van owned by Deron Carey and operated by Darryle Tate rear-ended a vehicle driven by Tina Williams, causing Williams’ vehicle to collide with the driver’s side of a vehicle driven by Matilda Robieheaux. At the time of the collision, Tate was returning to Hackbarth Delivery Services, Inc. (“Hackbarth”) from his delivery route. Neither Carey, who owned the van, nor Tate, who operated the van, had a policy of automobile liability insurance.
Robieheaux filed a petition for damages naming Tate, Carey, and her insurer, State Farm Mutual Automobile Insurance Company, as defendants. She later amended her petition to add Hackbarth and Subcontracting Concepts, Inc. (“SCI”) as defendants, alleging that Carey and Tate were employees of Hackbarth and SCI, and therefore Hackbarth and SCI were vicariously liable for Ms. Robicheaux’s injuries.
Hackbarth and SCI each filed a motion for summary judgment asserting that since Carey and Tate were not their employees, but rather independent contractors, Hackbarth and SCI were not vicariously liable for Robicheaux’s injuries. Finding that Carey and Tate were independent contractors, the trial court granted both motions for summary judgment, dismissing Robicheaux’s claims against SCI and Hackbarth. Robieheaux filed a motion for new trial, which was denied, and this appeal followed.
*403 IsDISCUSSION
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1084, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). In determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony, or weigh evidence. Fernandez v. Hebert, 06-1558, p. 8 (La.App. 1 Cir. 5/4/07), 961 So.2d 404, 408, writ denied, 07-1123 (La.9/21/07), 964 So.2d 333. A fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. Anglin v. Anglin, 06-1233, p. 5 (La.App. 1 Cir. 6/9/06), 938 So.2d 766, 769. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of trial on the merits. Fernandez v. Hebert, 06-1558 at 8, 961 So.2d at 408. Summary judgment is favored and “is designed to secure the just, speedy, and inexpensive determination of every action.” La. C.C.P. art. 966(A)(2).
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court’s determination of whether summary judgment is appropriate. Sanders, 96-1751 at p. 7, 696 So.2d at 1035. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable |4to this case. Walker v. Phi Beta Sigma Fraternity (RHO Chapter), 96-2345, p. 6 (La.App. 1 Cir. 12/29/97), 706 So.2d 525, 528.
Louisiana Civil Code article 2320 provides that employers are answerable for the damage occasioned by their employees, in the exercise of the functions in which they are employed. For an employer to be held liable under article 2320, the plaintiff must show that a master-servant relationship existed between the tortfeasor and the employer, and the tortious act of the tortfeasor was committed during the course and scope of his employment with the employer. Hughes v. Goodreau, 01-2107, pp. 5-6 (La.App. 1 Cir. 12/31/02), 836 So.2d 649, 656, unit denied, 03-0232 (La.4/21/03), 841 So.2d 793.
The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis. Tower Credit, Inc. v. Carpenter, 01-2875, p. 6 (La.9/4/02), 825 So.2d 1125, 1129. To determine whether a worker is an independent contractor or an employee, the court must examine the control exercised by the employer over the worker. Hughes, 01-2107 at p. 6, 836 So.2d at 656. The term “independent contractor” connotes a freedom of action and choice with respect to the undertaking in question and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants. The relationship presupposes a contract between the parties, the independent nature of the contractor’s business, and the nonexclusive means the contractor may employ in accomplishing the work. Moreover, it should appear that the contract calls for specific piecework as a unit to be done according to the independent contractor’s own methods, without being subject to the control and direction of his employer in the performance of the *404 service, except as to the result of the services to be rendered. It must also | ¡¡appear that a specific price for the overall undertaking is agreed upon and that its duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach. Hughes, 01-2107 at p. 6, 836 So.2d at 656, quoting Hickman v. Southern Pacific Transport Co., 262 La. 102, 117, 262 So.2d 385, 391 (1972). It is not the supervision or control which is actually exercised which is significant, but whether, from the nature of the relationship, the right to do so exists. Hughes, 01-2107 at p. 7, 836 So.2d at 656. See also Tower Credit, Inc. v. Carpenter, 01-2875 (La.9/4/02), 825 So.2d 1125.
It is undisputed that Tate was on his delivery route at the time of the collision; therefore the issue before the court is whether Tate was performing this work as an employee or an independent contractor. The following evidence of the relationship between Tate, Carey, Hackbarth, and SCI was before the court of the motion for summary judgment:
SCI is a corporation which brokers courier and messenger delivery services for its customers. Hackbarth operates a delivery service specializing in appliance deliveries, pharmaceutical deliveries, banking deliveries, and other routed work. Hackbarth obtains the services of delivery drivers from SCI. Tate and Carey each executed a contract with SCI entitled “Independent Contractor Owner/Operator Agreement.” The contracts provided that Tate/Carey (“the independent contractor”), as the operator of a delivery service for entities engaged in the dispatching of delivery services, would make deliveries for SCI’s customers using vehicles owned or leased and maintained by the independent contractor. In lieu of rendering services directly, the independent contractor was entitled to employ, furnish, and supervise qualified licensed drivers and other personnel for the performance of the delivery assignments accepted by him. Furthermore, SCI and the ^independent contractor agreed that no employer/employee relationship would be created under the contract, and the independent contractor would be solely responsible for any Federal, State, and local income taxes, social security taxes, withholding taxes, payroll taxes, unemployment taxes, and any other taxes imposed in connection with the delivery services. The independent contractor would also be responsible for securing and maintaining his own worker’s compensation or occupational accident insurance, disability insurance, and automobile and general liability insurance, as well as paying all expenses which are normal costs of doing business (tolls, fuel, oil, tires, repairs, garaging, parking, maintenance of the vehicles, employee salaries, etc.). The contracts contained a provision stating that SCI and its customers were “concerned only with the result, rather than the method by which the result is achieved,” and the independent contractor would be free to select his own routes and order of deliveries, taking into account the customer’s requests, needs, and deadlines. The independent contractor was to be paid per completed delivery, according to an agreed-upon schedule of negotiated rates, within thirty days following SCI’s receipt of the independent contractor’s invoice. The independent contractor also had the right under the contract to accept or reject assignments from SCI, its customers, or any other carrier. The contracts were for a term of ninety days, subject to automatic ninety-day renewals, unless either party desired to terminate the agreement; the contract provides for a $500 penalty for termination without ten days notice.
*405 Tate began working as a delivery driver for SCI and Hackbarth after his brother-in-law, Carey, who was already an independent contractor for SCI making deliveries for Hackbarth, selected him to become one of his delivery drivers. Tate made deliveries for Hackbarth’s customers using |7Carey’s vehicles. Tate testified that he did not punch a time clock and he did not have a work schedule; he simply worked when Carey told him to and was paid for the deliveries made.
Carey testified that he was free to choose which routes to take and which to reject, and he had rejected routes in the past when he was not making enough money off of them. Carey would get paid by SCI for the deliveries made after submitting the appropriate documentation, and would pick up the check from Hackbarth’s office. Carey testified that he would pay Tate a flat fee per delivery made for him.
Patrick Kannapel, Hackbarth’s Chief Financial Officer, testified that Hackbarth’s customers would provide them with times for their deliveries to be made and would provide the product to be delivered, and Hackbarth would convey that to the delivery drivers. The independent contractors supplied to Hackbarth by SCI did have to be approved by Hackbarth, and when a contractor chose to hire other drivers to make his deliveries, such as Carey did with Tate, Hackbarth also had to approve of those drivers. Mr. Kannapel testified that when required by Hackbarth’s customers, the delivery drivers would have to wear a uniform. However, he testified that there was not a specific uniform required; the customer requirement was just that the driver wore some sort of uniform. Every driver could choose his own uniform. The drivers had time requirements within which to make deliveries, but there was no requirement for the driver to check in with Hackbarth or to have a phone with him so that Hackbarth could contact him. Hack-barth would ascertain that the time requirements were fulfilled when the driver’s paperwork was returned to Hackbarth after making the deliveries. After receiving the driver’s contractor invoice summary, Hackbarth would forward it to SCI. SCI would then invoice Hackbarth for | sthe services rendered, and after Hackbarth paid SCI, SCI would forward the driver’s payment.
Considering the evidence before the court on the motion for summary judgment, including the contract between the parties and the testimony regarding their relationship, it is clear that Tate and Carey were independent contractors. The control actually exercised by SCI/Hack-barth over Tate and Carey was minimal, and clearly indicative of an independent contractor relationship, rather than an employer-employee relationship. Summary judgment dismissing the claims against Hackbarth and SCI was appropriate.
CONCLUSION
The judgment appealed from is affirmed. Costs of this appeal are assessed to plaintiff, Matilda Christina Robicheaux.
AFFIRMED.